Weldon, J.,
delivered the opinion of the court:
The petition alleges that the defendants became indebted to the claimant, on the 1st day of July, 1862, for money laid out and expended to and for the use of defendants, a,t their request, in the sum of $3,131,188.02, and of this there has been paid the sum of $3,000,000, leaving a balance due the petitioner of $131,188.02.
It is further alleged that the necessity of said expenditure grew out of the wants of the Government in the early i>art of the civil war, and that, for the purpose of maintaining national authority through their proper officers, said defendants requested the State of New York, in common with other States, to provide means and munitions of war for the use of the Government; that in pursuance of such request the claimant did provide and render to the United States a large number of troops, and did equip the same with arms, clothing, and munitions of war, and did also render to the Government arms and munitions in addition to such as were required for the use of troops enrolled in the State of New York; that in equipping-said troops and in furnishing said material for other troops the said State expended the sum of $3,000,000; that in complying with said request so made by the defendants in furnishing equipments for troops, the claimant was compelled to borrow a large part of said sum, there not being in the treasury of said State funds sufficient to meet said expenditure; that bonds of said State were issued upon which claimant was compelled and did pay a large amount of interest, to wit, the sum of $131,188.02; that under the act of Congress of J uly 27,1861, a portion of the expenditure of said claimant has been paid by defendants, but there still remains unpaid a portion of the costs, charges, and expenses properly incurred by said State *490 iii enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting said troops as aforesaid, to wit, the amount paid by the State of New York for interest, the said sum of $131,188,02 5 that after the payment of said sum, and within six years from such payment, a claim for said amount was presented to the Secretary of the Treasury, and such proceedings were thereon had in the Treasury Department and before the proper officer thereof, to wit, the Second Comptroller, that on or about the 23d day of December, 1869, the question of said claim for interest so paid by the State of New York as aforesaid against the United States was suspended, subject to future decision; and thereafter, on or about the 7th day of June, 1882, the said claim and the question of the validity thereof was presented to the Attorney-General of the United States for his opinion, and said Attorney-General thereafter, and on or about the 23d day of July, 1883, rendered his opinion thereon, and the same was filed in the Treasury Department of the United States, which opinion is to the effect that said claim of the State of New York does not come within the provisions of the act of July 27, 1861. Thereafter such proceedings were had in the Treasury Department in the matter of said claim that, at the request of said claimant by its attorney in fact, on or about the 3d day of January, 1889, the Secretary of the Treasury did, under the provisions of section 1063 of the He vised Statutes of the United States, transmit the said claim, with all the vouchers, papers, proofs, and documents pertaining thereto, to the Court of Claims, there to be proceeded in accordance with law.
The findings in substance tend to maintain the allegations of the petitions, except in the amount actually paid by claimant as interest on the funds used in the purchase of material and the payment of expenses incident to the equipment of troops.
Of said $131,188.02 the sum of $39,867.18 is based upon the following state of facts:
Under the tax rate of 1860 of said State there had been levied, collected, and paid into the treasury of said State the sum of $2,039,663.06 for the benefit of the canal fund, which money reached the treasury in April and May, 1861, and was then in the treasury, to be invested by certain State officers, pursuant to the law and requirements of the constitution of the State, in securities, for the benefit of the canal fund.
*491 Oil the 21st day of May, 1861, the lieutenant-governor, comptroller, treasurer, and attorney-general, who constituted the commissioners of the canal fund, authorized the comptroller to use $2,000,000 of the canal-fund money for military purposes until the 1st day of October following, and $1,000,000 until the 1st day of January, 1862, at 5 per cent, and of this amount the sum of $1,623,501.19 was used by the comptroller for the purpose of defraying the expense in raising and equipping troops as aforesaid.
On December 28, 29, and 31, 1861, the United States repaid to the State on account of moneys so expended the sum of $1,113,000, leaving the sum of $510,501.19 unpaid of the moneys which had been used from the canal fund, and which sum was placed to the canal fund, with interest, on April 4, 1862,
The total amount of interest on the money so used from the canal fund, during the time that it was used by the State for the public defense, in raising troops, was $48,187.13. But, during the same time, the State received interest on some portions of the money, while it was lying in bank, to the amount of $8,319.95, and the net deficiency of the State on account of interest on such moneys during the period which they were so used is $39,867.18, which sum was paid into the canal fund from the State treasury April 4,1862.
The order made by said State officers under and by virtue of which the money of the canal fund was appropriated is as follows:
“State or New York, Oakal DepartmeNt,
“ Albany, May 21, 1861.
“ The comptroller is to be permitted to use two millions of dollars of the canal fund monies for military purposes until the first day of October next, when the commissioners of the canal fund will invest one million dollars of the canal sinking fund under section 1, article 7, in the tax levied for military purposes until the 1st of July, 1862, at five per cent., and the comptroller may use one million of dollars of the tax levied to pay interest on the $12,000,000 debt until the 1st of January, 1862, when the commissioners will, if they have the means, replace that or as large an amount as they may have the means to do it with from the toll of the next fiscal year, so as that the whole advance from the canal fund on account of the tax be two millions of dollars. It is understood the comptroller will retain the taxes now in the process of collection for canal pur *492 poses until the above investments are made, paying the funds five per cent interest therefor.,
“Endorsed: We assent to the within-named arrangement, Albany, May 22, 1861.
“ R. Campbell,

“Lieut. Oovr.

“ Robert Dennison,
“P. Dorsheimer,
“ Ohs. G-. Myers,
“ Gomm’s of the Canal Fund.”
The amount of money actually paid as interest on the bonds issued is $91,320.84, and the amount of interest credited to and paid into the canal fund for the money used of said canal fund is $39,867.18; those two sums make in the aggregate the sum of $131,188.02, and for that amount this proceeding was commenced and is prosecuted.
Incident to the commencement of the civil war, which was inaugurated in its hostilities by the bombardment of Fort Sumter by the Confederate forces, there arose an emergency and crisis in the history and condition of the United States .which called for the most effective and vigorous measures of military preparation on the part of the Federal power to maintain its authority, and to preserve from dismemberment the union of the States. And although the requisition of the 75,000 troops provided for in the first proclamation of the President was thought to be adequate, the subsequent development and magnitude of the insurrection demonstrated the inability of that force fo accomplish the purpose of reestablishing the national supremacy in the States assuming to exercise the right of secession and the maintenance of that right by military force.
At the time of the commencement of the war Congress was not in session, and the executive department was compelled to avail itself of all the constitutional means within its power to deal with an existing state of hostility, and for that purpose, on the 15th of April, 1861, the President issued a proclamation calling for the militia of the several States, “ in order to suppress combinations and cause the laws to be duly executed.”
Upon the same day the legislature of New York passed an act making an appropriation of $3,000,000 to be applied in the expenditure for arms, supplies, and equipments for the soldiers mustered into the service of the United States in the suppres- *493 8 ion of the rebellion; and every assurance was given by tbe executive branch of the Government that the State would be reimbursed in its expenditures in complying with the requirements of the President.
The same proclamation which called for 75,000 men called an extra session of Congress for the 4th day of July following; and in pursuance of that proclamation the first session of the Thirty-Seventh Congress was held.
On the 27 day of July, 1861, Congress passed an act entitled “An act to indemnify the States for expenses incurred by them in defense of the United States, as follows:
“That the Secretary of the Treasury be, and he is hereby, directed, out ofany moneys intheTreasury not otherwise appropriated, to pay to the governor of any State, or its duly authorized agents, the costs, charges, and expenses properly incurred by said State for enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting, its troops employed in aiding in suppressing the present .insurrection against the United States, to be settled upon proper vouchers to be filed and passed upon by the proper accounting officers of the Treasury.” (12 Stat. L., 276.)
On the 8th of March, 1862, Congress passed a joint resolution as follows:
“ Whereas doubts have arisen as to the true intent and meaning of an act entitled ‘An act to indemnity the States for expenses incurred by them in defense of the United States,’ approved July 27th, 1861.
“JBe it resolved by the Senate and Souse of Representatives in Congress assembled, That the said act shall be construed to •apply to expenses incurred as well after as before the date of the approval thereof.”
Some question was made in the brief and oral argument of the counsel for the defendants as to proper pendency in this court of these proceedings because of the statute of limitations.
In the case of Finn v. The United States (123 U. S. R. 227) it is decided:
“ It is a condition or qualification of the right to a judgment against the United States in the Court of Claims that the claimant, when not laboring under any one of the disabilities named in the stat*e, voluntarily put his claim in suit or present it to the proper Department for settlement within six years after suit could be commenced thereon against the Umted States.”
*494 The findings in the present ease show, that in 1802, in less than one year after the origin of the claim, the claimant presented it to the proper Department for adjudication and payment, and that from that time until the commencement of this case it was pending in the Department as an unadjusted claim. The State never abandoned it, and the United States through its proper officers never formally rejected it. It was pending in the Treasury Department, within the meaning of the decisions of the Supreme Court and this court, at the time it was transmitted under the order of the Secretary of the Treasury, as shown in the record.
It was not res judieataj.&nd does not come within the law laid down in the case of Jackson v. The United States (19 C. Cls. R., 504), and State of Illinois v. The United States (20, id. 342).
The court having jurisdiction of the claim, it must be disposed of on its merits.
It is manifest from the legislation that Congress intended to approve the action of the executive department in the assurance that the States would be reimbursed in their expenditures incident to the enrollment of the militia in defense of the national authority.
It is not necessary to examine and discuss the obligations of the States in such an unprecedented condition of the Federal Government. It is sufficient to assume that the liability of the defendants in this case depends upon the construction of the act of 18G1, and the joint resolution of 1862.
If the claim comes within the scope and terms of the act of 18G2, the plaintiff has the right to recover; if it does not, there is no liability.
The aggregate of the demand is $131,188.02, and is composed of two items, originating in different forms.
Ninety-one thousand three hundred and twenty dollars and eighty-four cents compose a claim for interest paid by the State on bonds issued by it for the purpose of raising money to defray the expense incident to the enrollment of the soldiers for the national service.
The findings show that the Treasury o$ the State of New York, at the time the call was made, was deficient in the funds requisite to meet the expense, and that it was necessary to negotiate bonds at 7 per cent interest to supply that deficiency. *495 The said sum of $91,320 is the amount of interest paid on those bonds.
The other item, $39,867.18, of the claim is for an alleged expense growing out of the use of certain funds coming into the treasury of the State prior to October 1, 1861, and which were to be invested by the State officers, pursuant to the requirements of law and the constitution of the State, in securities for the benefit of the canal fund.
In connection with this item of claim it may be said that no interest was paid by the State of New York; it simply failed to realize for the benefit of the canal fund certain interest which by the investment of the money appropriated for the use of the defendants, it might otherwise have saved to that fund.
We will consider the rights of the claimants as to each demand separately. It is contended on the part of the claimant that both items come legitimately within “costs, charges, and expenses,” as provided by the act of July, 1861, while the defendants insist., that as to both items of claim it is an attempt to compel the United States to pay interest on an alleged obligation where they have not expressly agreed to do so.
Section 1091, Eevised Statutes, provides:
“ No interest shall be allowed on any claim up to the time of the rendition of judgment thereon by the Court of Claims, unless upon a contract expressly stipulating for the payment of interest.”
In the case of Tillson v. United States (100 U. S. R., 43) it was in substance decided:
“ Where the claim of a party for loss and damage growing out of the alleged failure of the United States to perform its contracts with him, as to time and manner of payment, is, by special act of Congress, referred to the Court of Claims, ‘ to investigate the same, and to ascertain, determine, and adjudge the amount equitably due, if any, for such loss and damage : ’ Held that the rules of law applicable to the adjudication of claims by that court in the exercise of its general jurisdiction must govern, and that interest, not having been stipulated for in the contracts, can not be allowed thereon.”
It is not necessary to speculate upon the question of the liability of the Government for the payment of interest as such. The statute and decisions are plain and uniform on that subject, and unless there is an express contract to that effect *496 no interest can be recovered. If this demand is in law a claim for interest, in the common and judicial sense of that term, there being no express undertaking to pay interest in and by the words of the statute on which the suit is based and from which the obligation is deduced, no liability exists. It is contended by the claimant’s counsel that this is not a proceeding to recover interest as such, but that the demand comes within that clause of the statute providing indemnification to the State for “ costs, charges, and expenses ” incurred by it in furnishing troops under the call of the President.
A liability upon the part of the Government to pay interest can not arise from implication, for the reason that the statute defining the jurisdiction of the court expressly declares that no interest shall be allowed on any claim up to the rendition of the judgment thereon in the Court of Claims, unless upon a contract expressly stipulating for interest.
Regarding the statute as bavingAhe force of a contract, it has no provision from which by construction it can be inferred that the defendants assumed to pay the claimant any interest as such upon any advances made by it in defraying the expenses of the troops furnished the United States in pursuance to the proclamation of the President.
The law being, that the Government does not pay interest except where the contract or statute expressly provides for the payment of interest, it is unnecessary to examine the many cases referred to by the very able argument of the counsel for the Government. If this is a proceeding to enforce the payment of interest, then the authorities relied on by the defendants are conclusively decisive of this case, and the judgment must be for the defendants.
It was not the duty of the State of New York, as one of the States of the Federal Union, acting independently, to suppress the insurrection of 1801; but it was its duty to comply with all constitutional requisitions of the Central Government, in its efforts to maintain the authority of the United States, and to enforce the law of Federal jurisdiction.
The findings show, that, in responding to the call of the President for men and means, the authorities of the State did everything in their power to comply with the Federal requisition, and in so doing not only availed themselves of the taxing power of the State, but the public credit of the State *497 government sought the money market to replenish the treasury of the State, in defraying the expenses incident to the call of the President.
In appreciation of the alacrity with which the authorities acted, Congress on the 27th of July, 1861, twenty-three days after the convention of the houses, passed the act upon which the claimant now seeks satisfaction and compensation.
It is alleged on the part of the claimant that—
“The act of July 27,1861, constitutes a statutory contract of indemnity on the part of the United States with the several States furnishing troops as therein specified, and the payments made by the State of New York, for which this claim is filed, having been actually and necessarily made for the purpose contemplated by that act, they became part of the expenditures made by the State which the Federal Government has obligated itself to reimburse.” (Huidekoper’s Lessee v. Douglas, 3 Cranch, R., 1-70.)
The demand of the claimant does not necessarily require that it should maintain the full legal import of this proposition, as the statute of our jurisdiction provides that this court shall have jurisdiction of “All claims founded upon the Constitution of the United States or on any- law of Congress.” (24 Stat. L., 505.)
If by the terms of the act of July, 1S62, Congress assumed to pay the claimant the kind and character of charges represented by the interest paid by the State, and have not done so, the right of the State to recover is clear and unquestionable; and the only question for us to decide in this connection is, whether the payment of interest on bonds issued by the claimant comes within the terms “costs, charges, and expenses properly incurred by said State.”
In determining that question, we must not lose sight of the fundamental proposition of law, that the Government is not liable for interest, unless it has expressly obligated itself to pay interest, and it is not pretended that it has done so in this matter. Whatever may be said in the construction of this statute, the fact remains that the claimant in the payment of interest to its bondholders disbursed and expended its money as effectually as though it had paid money directly from the treasury to some person from whom it had purchased clothing and munitions of war.
*498 If the State of New York had limited its effort in complying with the request of the General Government to its actual resources of money in the treasury, it might have been the performance of its duty literally; but if the resources of its credit were opened to it, and it did not avail itself of that resource, the spirit of its obligation would have been violated to the detriment of the public service, and perhaps to the prejudice of the final success of the Federal power. The statute, it will be observed, is broad and liberal in the use of terms defining the obligation of the United States, “ costs, charges, and expenses.”
In the construction of a law somewhat similar to act of July, 1862, Mr. Wirt, Attorney-General of the United States, gave an opinion, stating,
“ In constructing this law, it is proper to advert to the principle on which it was founded and to the object which it proposes to effect. The principle is this: The United States are bound by the relation which subsists between the general and State governments to provide the means of .carrying on war, and, as a part of the business of war, to provide for the defense of the several States. When the United States fails to make such provision, and the States have'to defend themselves by means of their own resources, the expenditure thus incurred forms a debt against the United States which they are bound to reimburse. If the expenditures made for such purpose are supplied from the treasury of the States, the United States reimburse the principle without interest; but if, being itself unable, from the condition of its own finances to meet the emergency, such State has been obliged to borrow' money for the purpose, and thus to incur a debt on which she herself has had to pay interest, such debt is essentially a debt due by the United States, and both the principal and interest are to be paid by the United States. So that whenever a State has had to pay interest by reason of her talcing the place of the United States in time of war, such interest forms a just charge against the United States. If a State borrows the money at once, on the first occurrence of the emergency, and expends the specific money so borrowed, both the borrowing and the expenditure being flagrante bello, there seems to be no doubt that the claim, both for the principal and the interest which she would have paid upon such loan, would be a fair charge against the United States on the principle of this law? (1 Op. Atty. Gen., 723.)
Although this opinion was given before the statute forbidding the payment of interest was passed (March 3, 1863, Rev. Stat., 1091), it is important to be considered, in making a legal *499 distinction, between interest actually paid and interest on funds in the Treasury at the time the requisition was made.
“ It has been the general rule of the officers of the Government in adjusting and allowing unliquidated and disputed claims against the United States to refuse to give interest. That this rule is sometimes at variance with that which governs the acts of private citizens in a court of justice would not authorize us to depart from it in this case. The rule, however, it not mere form, and especially is it not so in regard to claims allowed by special acts of Congress or referred by such acts to some Department or officer for settlement.” (McKee’s Case, 91 U. S. R., 442, and 11 C. Cls. R., 72.)
In the performance of the duty under the call, the officers of the State purchased the required munitions of war so long as they had funds; and when they had no money, the government still needing the supply, they paid out money for the use of money, in order that the State might fully discharge every possible duty in the restoration of Federal authority. The payment of interest was a cost properly incurred by the claimants under the requisition of the President, and comes within the letter of the act of July, 1862, and for that item the claimants have a right to recover.
The second item of claim for $39,867.18 originates in a different form. There was no absolute payment of interest. Under the State policy of New York a portion of the tax is devoted to what, is called the canal fund, and upon this fund the State is in the habit of receiving interest, the same being loaned for the benefit of that fund.
The appropriation of the canal fund for the purpose of defraying-the expense of equipping the troops of the United States was in the pursuance of the following order:
“ State oe New York, Canal Department,
“Albany, May 21, 1861.
“The comptroller is to be permitted to use two millions of dollars of the canal fund monies for military purposes until the first day of October next, when the commissioners of the canal fund will invest one million of dollars of the canal sinking fund under section 1, article 7, in the tax levied for military purposes until the 1st of July, 1862, at five per cent., and the comptroller may use one million of dollars of the tax levied to pay interest on the $12,900,000 debt until the 1st of January, 1862. when the commissioners will, if they have the means, replace that or as large an amount as they may have *500 tbe means to do it with from the toll of the next fiscal year, so as that the whole advance from the canal fund on account of the t>ix be two millions of dollars. It is understood the comptroller will retain the taxes now in the process of collection for canal purposes until the above investments are made, paying the funds five .per cent, interest therefor.
.“Endorsed: We assent to the within-named arrangement.
Albany, May 22,18G1.
“ R. CAMPBELL,
" Lieut. Gov’t. “Robert Denniston,
“P. Dorsiietmek,
“Ohs. G-. Myers,
“ Comm’s of the Canal Fund.”
The amount of interest on the money so used of the canal fund during the time it was used by the State for the public defense in raising troops was $48,187.13. But during the same time the State had received interest on a portion of the funds while it was lying in a bank unused to the amount of $8,319.95, and the net deficiency to the State on account of the interest on such money is $39,867.18.
Upon the payment of the money into the treasury from which this interest would have accumulated it became the money of the State, and would have so remained after it became a part of the canal fund. While different departments are provided in the State as well as the National Government, they constitute a part of an indivisible unity; and transactions between the different departments are the official act of the same political power.
The money is transferred from one department to another, or from one fund to another, but it can not be said that by the transfer there is a lending of money, upon which by any fiction of law interest can be calculated. By the use of the canal fund for the purpose of defraying the expense of raising troops the State simply appropriated from a particular fund, which, if permitted to become a part of that fund, might have been loaned on interest. It can not be said that the United States borrowed the money at the agreed rate of interest which other customers would have paid the State, as there is no express or implied obligation to that effect. The State paid no money directly for the use of the money belonging to the canal fund. There may have been an accounting to that fund from some other financial resource of the State; but that transaction was *501 entirely between the different departments of the government which constitute the political organization of the State of New York.
If an allowance is made for the loss on that fund, it is in effect an allowance of interest against the United Statps on an obligation in and by which they have not expressly agreed to pay interest. During the time the money was diverted from the canal fund to the purposes of the United States the State simply lost the use of that amount. The interest charged on the trust fund can not be said to be an “ expense incurred ” within the meaning of the law of 1862, as the State did not assume any liability, nor pay any money beyond the actual funds appropriated and paid in the purchase of materials, and the payment of the expenses of the transportation of troops. In the claim for $91,320.84 a different element exists.' The claimant actually paid that amount of money to creditors who had advanced money on the bonds of the State, which had been issued to defray the costs, charges, and expenses properly incurred “ by the State in enrolling, subsisting, clothing, supplying, paying, and transporting” troops employed by the defendants in suppressing the insurrection against the authority of the United States.
In the discussion and determination of the question of the liability of the United States to' remunerate the claimant we must not lose sight of what is so fundamental, not only in the laws of the United States and decisions of the Supreme Court, but in the jurisdiction of this court, that the defendants are not liable for interest as such unless they have expressly agreed to pay interest. In subordination to that well-established principle of the law the purpose and construction of the act of 1862 imfst be ascertained and determined. Whatever may be said of the liability of the defendants in the absence of said statute on the first item of claim, it is clear that for the second they would not be liable; because it is for interest upon an obligation in which they have not expressly agi eed to pay interest.
In the legal statement of a cause of action, founded upon the transactions of 1861, between the plaintiff and defendants, the pleading must necessarily allege that the $39,867.13 was interest upon certain advances made by the State, which interest was lost by the claimant because the money was not in *502 vested in interest-bearing obligations due the State. The' marked difference between the two items of claim is, that in one there was an actual payment of money by the State in complying with the requisition of the General Government; while in the other there was no payment, but a failure to receive interest because of a diversion of the fund as herein indicated.
It does not affirmatively appear that the f«nd upon which the claim of $39,867.18 is based could for the period of time it was used by the State for the benefit of the defendants have been loaned; and if during that period other money of that fund was unemployed, the said fund would have been a surplus in the treasury of the State, and no interest was lost to the claimant.
It* has been the rule of the Department and the policy of the Government not to pay interest upon claims against the United States, founded on the reason that the Government is always ready to pay all just claims, and if such claims are not paid it is the fault of the claimant in not presenting his claim in apt time, or in not presenting in such a way as to convince the officers of the Government of its lawfulness and justice.
It will be observed that Mr. Attorney-General .Wirt makes the distinction between the payment of interest upon money borrowed to enable the State to discharge its duty and fulfill its obligation, and interest upon funds in the treasury of the State appropriated for the use and benefit of the United States. The allowance of interest “ as expense charges and costs ” in the construction of the act is in derogation of the general policy of the Government in not paying interest, and should not be extended beyond the logical limits of the act of 1862.
The Chief Justice is of opinion that—
“The claimant is seeking indirectly to recover interest contrary to Revised Statutes, section 1091, which prohibits its allowance ‘unless upon a contract expressly stipulating for payment of interest.’
“The case was transmitted to this court by the Secretary of the Treasury as a claim for interest alone.
“Interest on temporary loans made to obtain money for equipping, etc., troops for the United States is no more a charge against the Government under the act of 1861 (12 Stat. L., 276) than is interest on long-time bonds issued by many States for the same purpose, computed to time of payment by *503 the Government, for which it is conceded the United States are not liable.
“In either case interest paid constitutes no part of the ‘ costs, charges, and expenses properly incurred by said State for enrolling', subsisting, clothing, supplying, arming, equipping, and transporting its troops’ within the meaning of the act. It is paid for another purpose, to wit,' for the use of money raised to supply an empty treasury; an indirect expenditure, dependent upon collateral contingencies, upon the different conditions of the treasuries, and the different and uncertain legislation of the several States for raising money by taxation, obviously not within the contemplation of Congress, and never allowed by the Treasury Department to any State under this act.
“An unequal application of the statute in the different States could not have been intended by Congress.
“If the claim be not for interest within the intent and meaning- of the .Revised Statutes, section 1091, then, as one for the cost of supplying money to the State treasury, it is not unlike a claim for the cost of assessing and collecting taxes for the same object, sooner or later to be incurred, and which, whether incurred before or after the expenditures, it is apprehended nobody would contend could be maintained under the act of 1861.
“Decisions of the courts and opinions of the Attorneys-Geueral before the enactment of the prohibition against allowing interest, and before the passage of the act upon which this suit is founded, or independently of them, can have no bearing on this case which must be governed by the existing statutes and the intention of Congress.”
“The only Attorney-General’s opinion upon the interpretation of the act of 1861 is that of Attorney-General Brewster on this very claim, wherein he advised against its validity (17 Opinions Atty. Gen., p. 595).”
It is the judgment of the court that the claimant recover the sum of $91,320.84 and that the $39,867.13 be disallowed.