Davis, J.,
delivered tbe opinion of tbe court:
On tbe 4tli May, 1865, tbe direct-tax commissioners of tbe United States for tbe insurrectionary district of Arkansas sold at public sale a parcel of land, with a bouse on it, in Little Rock, for non-payment of a direct tax assessed tbereon, to Mrs. Matilda Johnson, in whom tbe title of record was vested. Tbe amount of tbe tax was $37, and there was, in addition, a penalty of $18.50, making an aggregate of '$55.50 due to tbe United States. Tbe property sold for $3,000, all of which went, either directly or indirectly, into tbe Treasury of tbe United States. This suit is brought to recover tbe surplus over tax, penalty, costs, and commissions.
Tbe act of August 5, 1861, authorized a direct tax of $20,000,000 to be annually laid upon tbe United States. Of this, $261,886 was apportioned to tbe State of Arkansas. Due provisions were made for tbe assessment and collection of tbe tax within each State, and for tbe sale of real estate for nonpayment of tbe tax assessed upon it. It was also provided that “tbe surplus of the proceeds of the sale, after satisfying tbe tax, cost, charges, and commissions, should be paid to tbe owner of tbe property or bis legal representatives, or if be or they could not be found, or should refuse to receive tbe same, then such surplus should be deposited in tbe Treasury of tbe United States, to be there held for tbe use of tbe owner or bis legal representatives, until be or they should make application therefor to tbe Secretary of tbe Treasury, who, upon such application, should, by warrant on tbe Treasury, cause tbe same to the paid to tbe applicant.”
Had legislation rested here, and bad tbe tax upon tbe claimant’s land been assessed and collected under tbe jaro visions of this law alone, tbe present dispute, probably, would not have arisen. Tbe deposit of tbe surplus in tbe Treasury would have been held for tbe use of tbe owner, and on proper application therefor a warrant would have been issued for its payment.
But tbe course of tbe war made it impossible to execute this law in tbe districts occupied by tbe armed forces of tbe enemy. To remedy this, Congress, on tbe 7th of June, 1862, passed a law entitled “An act for tbe collection of direct taxes in insurrec-tionary districts within tbe United States, and for other purposes,” by which a special machinery was created for tbe collec *350 tion of this tax in the insurrectionary districts, of wbicb it is needless to say Arkansas was one. Within the loyal territory the tax had been assumed by the respective States. The new law authorized the creation of tax commissioners for each State in insurrection, and empowered these officers with the necessary authority to assess and collect the tax. By the seventh section of the act they were authorized to sell real estate for non-payment of the taxes assessed upon it. Some amendments were made to this section by the act of February 6,1863; and it was under the act as amended that the sale in this case took place. As the amendments did not affect the disposition of a possible surplus, they are immaterial in the view we take of the case. It is not disputed that all things necessary to give validity to the sale itself were done.
The claimant maintains that the act' of 1862 and its amendments made no provision for the payment of the proceeds of the sale into the Treasury; and he argues that, inasmuch as it could not be contemplated that the tax commissioners should retain the proceeds to their own use, the mandatory provisions of the act of 1861, which we have cited, must have continued in force.
He fortifies this argument, in the first place, by appealing to the opinion of the Supreme Court in Bennett v. Hunter (9 Wall., 326), wherein it is said that “ The acts of 1861 and 1862 are to be construed together. The general object of both was the same, namely, the raising of revenue by a tax on land. The first prescribed a mode of collection where the authority of the general government was ackowledged and no serious obstacle existed to the execution of the law; the second directed the mode of collection where this authority had been overthrown by insurrection but had been sufficiently re-established to make collection, to some extent at least, practicable. * * * The primary purpose of the act was undoubtedly revenue, to be raised by collection of taxes on lands.” From this the claimant argues that there could be no revenue from the tax if the proceeds of sales to enforce it were not paid into the Treasury; and he says that we must go to the act of 1861 to find a provision requiring the proceeds to be deposited there.
In the second place, he contends that a tax law which authorizes a sale of the property for non-payment of the tax, and the receipt by the government of the whole value resulting from the sale, without liability to account to the owner for any sur *351 plus wbicb may remain after payment of the tax and the legal penalty for non-payment and the costs of collection, is virtually a forfeiture of the property itself. He argues that Congress could not have intended this inequitable result; and, since the Supreme Court has already decided that the two statutes are to be construed together as a revenue law, he. further contends that we must look to the act of 1861 not only to find how the proceeds of the sale are to reach the Treasury, but also what is to be done with the surplus when it gets there.
The defendants’ counsel answered this by showing that the statute gave the owner of property sold for non-payment of taxes a right of redemption which, though it might be brief and onerous, precluded the idea of forfeiture or confiscation. He also referred to the twelfth section of the act of June 7, 1862, which provides that the proceeds of leases and sales shall be paid into the Treasury of the United States, and that one-fourth of them are to be subsequently paid over to the governor of the State wherein the lands are situated, or his authorized agent, when the insurrection should be put down and the people should elect a legislature and State officers who should take an oath to support the Constitution. He argued from this that the law has made a complete disposition of the surplus which is entirely inconsistent with the theory of the claimant’s case.
The claimant replied that the ninth section of the act of 1862 authorized the United States to take possession of and lease all lands whose owners should have abandoned them and gone to aid the rebellion, provided the same should be sold for non-payment of taxes and bid in by the United States; and that the eleventh section of the act made provisions, at the pleasure of the President, for the sale of such lands instead of a lease of the same. He contended that the provisions of the twelfth section, on which the defendants’ counsel relied, referred only to the leases which were authorized by the ninth section and the sales which were authorized by. the eleventh section, and had no ref-erance to general sales for non-payment of taxes made under the provisions of the amended seyenth section.
In this brief summary of the positions taken on each side, in the interesting discussion of this question, we have necessarily omitted many of the illustrations from the statutes with which counsel fortified their respective contentions. We have carefully considered the subject, and are with the claimant on this *352 point. The Supreme Court bas settled for us in advance that tbe statutes of 1861 and of 1862 are to be construed together as a revenue law. It follows that tbe provisions of tbe act of 1861 wbicb are applicable to tbe subjects affected by tbe law of 1862, and wbicb are not replaced by corresponding provisions in that law, remained in force after tbe passage of tbe law of 1862, and were applicable to tbe property subjected to tbe law of 1862 as well as to tbe property wbicb remained exclusively subject to tbe law of 1861.
This view, if correct, leaves us to determine only whether tbe twelfth section of tbe act of 1862 relates to tbe proceeds of all tax sales, or only to tbe proceeds of sale of lands abandoned by owners who bad gone to aid tbe rebellion, and wbicb are sold for .taxes and bid in by tbe United States.
Tbe seventh and eighth sections of that act terminate tbe consideration of tbe subject of tbe assessment and collection of taxes, of tbe sale of property for the non-payment of taxes, and of tbe rights of redemption of tbe same so-far as they are treated in tbe statute. Tbe ninth section proceeds to tbe treatment of quite another subject — tbe “other purposes” named in tbe title of tbe act — and the- ninth, tenth, and eleventh sections are exclusively occupied with provisions respecting tbe leases and sales of property of wbicb tbe United States may become proprietor or possessor under operation of a tax sale. When, therefore, tbe twelfth section, in immediate context with these sections, speaks of “ tbe proceeds of said leases and sales,” tbe natural grammatical inference is that it refers to the leases and sales authorized by tbe sections immediately preceding. It would be a strained construction to apply this language to sales authorized by tbe seventh section, wbicb could be justified only on tbe supposition that no other provision could be found for passing that money into tbe Treasury. In view of tbe fact that tbe forced construction insisted on by tbe defendants works out an inequitable forfeiture of tbe entire property for non-payment of a tax which forms but .a small- part of its value, while tbe logical result of tbe opinion in tbe 9th Wallace works out substantial justice, we have no- hesitation in bolding that tbe disposition of tbe proceeds of tbe sale of tbe claimant’s property is governed by the provisions of tbe act of 1861.
Tbe defendants further contend, however, that even if tbe claimant’s rights are to be measured by tbe statute of 1861, be *353 bas no standing in court, first, because tlie statute gives Mm no remedy here; and, second, because his remedy, if he has one, is barred by the statute of limitations. We will briefly examine these two inconsistent propositions.
In Knote's Case (95 U. S., 156) the Supreme Court says that the j urisdiction of this court is limited to claims founded upon a law of Congress, or upon a regulation of an Executive Department, or upon a contract, express or implied, with the government. The claim here presented [that is, in Khote’s Case] rests upon a supposed implied contract to pay to the claimant the money received as the proceeds of the forfeited property. To constitute such a contract there must have been some consideration moving to the United States, or they must have received sary corollary from this that, when the United States do receive money charged with a statutory duty, as in this case, to pay it over, an implied contract exists to pay the money over in the the money charged with the duty to pay it over.” It is a necessary corollary from this that, when the United States do receive money charged with a statutory duty, as in this case, to pay it over, an implied contract exists to pay the money over in the manner provided by tbe statute.
The next question is a more difficult one. The statute of 1861, as we have seen, provides that the surplus shall be held in the Treasury until the owner or his legal representative makes application for it, when it shall be paid to him. If the statute implies a contract to pay to the owner at once upon the deposit of the money, so that he can maintain an action for it without previous demand upon the Secretary of the Treasury, this suit is clearly brought too late. If, on the contrary, he cannot come here before the Secretary of the Treasury has heard Mm and decided against him, then his cause of action accrued on the refusal of the Secretary of the Treasury, and his suit is not barred by the statute. Though the question is not free from doubt, we take the latter view, and hold that the suit is not barred by the statute of limitations. We are the more ready to do this that the amount involved is less than $3,000.
But one more question remains on the merits. The defendants maintain that, admitting the claimant’s good status in court, and that the statute of 1861 is the law governing his case, the facts show no title in him to the alleged surplus. Mrs. Matilda Johnson, from whom the claimant’s title is derived, *354 was tlie widow of a former judge of tiie United States for tbe district of Arkansas, and there is nothing to lead us to question her title to the property at the time when she conveyed it to her daughter, Mrs. Jordan. We have no doubt of the delivery of the deed to the daughter, nor that it was properly put on record. All these circumstances operated as a. transfer of the propeiiy. This transfer is fortified by a subsequent conveyance from Mrs. Johnson of the right to receive the surplus from the tax sale. By the subsequent intermarriage of Mrs. Jordan with Mr. Taylor, her death, and his administration upon her property, his title is complete.
It follows from this that the court is of opinion that claimant is entitled to recover. Judgment will be entered in his favor for $2,929.50.