Peelle, J.,
delivered the opinion of the court:
The claim in this case was transmitted to the court by the Secretary of the Treasury by the following communication:
“TreasuRY Department,
“Office of the Secretary,
“ Washington, D. C., March 18,1899. uThe Honorable the Chief Justice

and Jitdges of the- Court of Claims:

“At the request of the Auditor for the War Department, in his letter of the. 14th instant, I have the honor to refer to your honorable court, under section 2 of the act of Congress approved March 3, 1883 (22 Stats., 485), otherwise known as the Bowman Act, to be proceeded in according to the provisions of said section, the claim of the State of - Maine, aggregating §212,678.62 (filed in the Auditor’s office April 20,1898), for the reimbursement of interest on moneys borrowed and alleged to have been expended in raising and putting into the field ten regiments of troops for the service of the United States, in aiding to suppress the rebellion.
“All the papers, proofs, documents, etc., pertaining to the claim, as received from the Auditor, are herewith transmitted.
“As stated by the Auditor, this claim appears to present controverted questions of fact and law, upon which it seems desirable to obtain the decision of the Court of Claims for the guidance.and action of this Department.
“The questions referred to are fully set forth in the letter of the Auditor dated January 14, 1899, a copy of which is herewith transmitted.
“Respectfully, L. J. Gage, Secretary J
*542 That portion of the letter of the Auditor for the War Department, at whose request the claim was transmitted, which states the controverted questions of fact and law upon which the decision of the court is asked is as follows:
“WASHINGTON, D. C., Jarmcvry 1%., 1899. “To the Honorable the Secretary op the Treasury:
“Sir:
# ¥r * >Jc *X- *X* *X* '
“1. Have the accounting officers jurisdiction to entertain, adjust, and settle this claim on its merits, under the decision in the case of the United States v. JVew Yorli (160 U. S., 598)?
“(a) Is this claim for interest on money borrowed and expended in equipping troops so intimately connected with the principal claims already allowed that the interest claim can be held to have been settled in the settlement of the principal claims on the doctrine that a claimant can not be allowed to split up his cause of action?
‘ ‘ (5) In view of the long delay in presenting this claim, is it ‘a stale claim,’ which the accounting officers should not entertain, adjust, or settle on its merits?
“2. If the accounting officers have jurisdiction and should settle the claim, for what time ought interest to be allowed?
“(a) Where long-time bonds were issued, should interest be allowed to the maturity of the bonds; if not, to what lesser time should it be allowed?
“ (i) Should interest be allowed beyond the time necessary for the State to levy a tax and collect the money required for the principal expenditure?
“3. If the court finds it has jurisdiction to determine the amount due, what amount, if anything, is the State entitled to on the evidence and facts presented?
“I transmit all the papers, proofs, documents, etc., pertaining to the claim, as requested.
“Respectfully, yours,
“W. W. Brown, Auditor.”
Section 2 of the act of March 3, 1883 (22 Stat. L., 485), under which the claim was transmitted, is as follows:
“ Section 2. That when a claim or matter is pending in any of the Executive Departments which may involve controverted questions of fact or law, the head of such Department may transmit the same, with the vouchers, papers, proofs, and documents pertaining thereto, to said court, and the same shall be there proceeded in under such rules as the court may adopt. When the facts and conclusions of law shall h,ave been *543 found, the court shall not enter judgment thereon, but shall report its finding's and opinions to the Department by which it was transmitted for its guidance and action.”
The claim thus transmitted is founded on the Act of July 27,1861 (12 Stat. L.', 276), which reads:
“ Be it enacted Toy the Senate and House of Representatives of the United States of Am-erica vn Congress assenMed, That the Secretary of the Treasury be, and he is hereby, directed, out of any money in the Treasury not otherwise, appropriated, to pay to the governor of any State, or to his duly authorized agents, the costs, charges, and expenses properly incurred by such State for enrolling, subsisting, clothing, supplying, arm--ing, equipping, paying, and transporting its troops employed in aiding to suppress the present insurrection against the United States, to be settled upon proper vouchers, to be filed and passed upon by the proper accounting officers of the Treasury.”
To remove any doubt as to the purpose of the act, Congress, •on March 8, 1862.(12 Stat. L., 615), declared the intent of Congress by resolution, as follows:
* * * * . *
“ Be it resolved by the Senate and House of Representatives of the United States of America in Congress assenMed, That the said act shall be construed to apply to expenses incurred as well after as before the date of the approval thereof.”
Under the reference thus made, the claimant filed a petition herein on the 23d day of March, 1899, and thereafter, by consent of both parties, the case was referred to the auditor of the court to investigate and take testimony and to report the facts to the court; and that having been done, the auditor files his report herein; and no exceptions having been filed thereto, and the same being in conformity with the evidence, the court adopts the same as the findings of fact.
“auditor’s report.
“The evidence submitted to the auditor consists of the testimony of the present treasurer of the State of Maine; an .attested copy of Maine’s ledger account for war purposes from April 29, 1861, to December 31, 1869; attested copies of an extract from the report of Maine’s treasurer for the year 1861, and of certain acts and resolves of the extra session of the Maine legislature approved April 24 and 25,1861, and of Gov *544 ernor Washburn’s address to said session, all of which are filed herewith; the auditor also made personal examination of certain books of account, papers, and vouchers in the War Department and in the office of the treasurer of Maine.
“From the report of Mr. Herman, made to the House of Representatives (Fifty-third Congress, third session, Report No.'1957, pp. 13 to 16, inclusive), it appears that the State of Maine enlisted, enrolled, armed, equipped, and caused to be mustered into the service of the United States to aid in suppressing the war of the rebellion 70,107 men and paid commutation on 2,007 more-, making a total of 72,114 men.
“Maine necessarily expended for the enrolling, arming, and equipping said 72,114 men the sum of $1,027,654.03, and the accounts for the same were properly presented to the Secretary of the Treasury of the United States under the Act of July 87, 1861 (12 Stat. L., 276), and were settled by proper vouchers, passed upon by the accounting officers of the Treasury Department.
“In a communication to the Secretary of the Treasury from the Third Auditor, dated June 19, 1894, it appears that the sums claimed by Maine, the dates when filed, the amounts allowed and disposed of, and the amounts disallowed, were severally as follows:
“Table I. — State of Maine.

“The United States paid to Maine said amounts allowed and disposed of in the sums and upon the dates following:
Table II. — Payments made by the limited States to the State of Maine.
September 2, 1861, No. 4911. §200,000. 00
January 14, 1862, No. 6354 .. 120,000. 00
March 2, 1867, No. 2236. 198,462.12
March 2, 1867, No. 2237. 357,702.10
November 22, 1867, No. 5545 10,682.23
September 5, 1868, No. 7708. 127,473. 34
October 16, 1868, No. 8361 .. 6, 728. 96
June 27, 1871, No. 7140. 3,938. 93
March 13, 1883, No. 410. 2,197.32
Total 1,027,185.00
*545 “(From the foregoing tables there appears to be due to Maine a balance of 1469.03, but tbe claimant admits that the same has been paid.)
“The regular session of the Maine legislature for the year 1861 met the first Wednesday in January and finally adjourned March 16, having made the annual appropriations for State purposes and levied the State tax for the current year, and on April 15, 1861, the date of the first call for troops, there was not, nor would there be during that year, any money in the State treasury which was not specifically appropriated for State purposes, and no money which could be used to defray the expenses of enlisting, enrolling, arming, equipping, and mustering troops into the service of the United States. To provide ways and means for those purposes, an extra session of the Maine legislature was called, which met April 22 and adjourned April 25, 1861. This extra session passed an act (chapter 60, Public Laws, extra session, Maine, 1861) authorizing the governor to raise and equip ten regiments, and appropriated 11,000,000 therefor, and also passed a resolve authorizing a loan of $1,000,000 to provide for.said appropriation.
“Pursuant to said resolve, Maine issued and sold bonds to the. amount of $800,000 and no more, all being payable in ten years from their date, and bearing interest at the rate of 6 per cent per annum, the then legal rate in Maine, payable semiannually according to the coupons attached to the bonds. .
“ Said bonds were issued in installments as follows: $250,000 May 10,1861; $300,000 July 1,1861; $250,000 August 1,1861; and sold for $800,000, their full face value, and a premium of $3,087.50.
“The issue and sale of all these bonds was necessary to provide the money required, and, the full amount of their face value, together with the premium and other moneys, was expended by Maine for war purposes.
‘ ‘ Maine paid the principal of each and every of said $800,000 bonds at maturity, together with the interest coupons thereon as the same became due, to the amount of $480,000 for the ten jmars, and after such payments both the bonds and the coupons were destroyed according to law.
‘ ‘All the items and vouchers therefor for which said $800,000 was expended are included in claim No. 1, made by Maine for reimbursement to the amount of $1,075,274.36, as appears in the above Table I.
“Said $800,000 was.expended by Maine as aforesaid in sums corresponding to the three several bonds issued, as follows: $250,000 from April 29 to July 1, 1861, of which the Treasury Department of the United States allowed $208,265.91 and *546 disallowed $41,734.09; $300,000 from July 1 to August 3,1861, of which $214,338.44 was allowed and $85,661.56 disallowed; and $250,000 from August 3 to September 21, 1861, of which $213,933.44 was allowed and $36,066.56 disallowed. In the aggregate of said $800,000 the accounting officers of the Treasury Department allowed $636,537.79 and disallowed $163,462.21.
“Said allowed sum of $636,537.79 was borrowed by the State of Maine as above set forth, and expended for purposes properly chargeable to the United States; and for the same the United States has reimbursed Maine under the provisions of the act of Congress above mentioned.
“Maine received from the United States $200,000 September 12, 1861, and $120,000 March 7, 1862, and all of the $320,000 so received, and more, was expended by Maine subsequent and in addition to the $800,000 derived from the bonds, and for items allowed by the Treasúry Department, as appears in the above Table I. Had it not been for said payments of $200,000 and $120,000, Maine would have been obliged to issue the remaining $200,000 bonds authorized by the appropriation, and also compelled to borrow large sums of money in addition thereto to meet her expenditures for war purposes.
“Maine assumed her quota of the direct tax levied under the act of Congress approved August 5, 1861, by reason of which there ivas due and payable from Maine to the United States $357,702.10 June 30, 1862, on which date said sum was credited by Maine to the United States, but it appears that the latter did not charge it off as paid until March 2, 1867 (item No. 2237, Table II).
“Maine received from the United States March 18, 1867, • $184,462.12; April 22, 1867, $10,000; November 29, 1867, $10,682.23, and December 16, 1867, $4,000. The first, second, and fourth of -the preceding items together make the third item in the above Table II, appearing there as $198,462.12 under date of March 2, 1867. All other items of payment by the United States to Maine are the same as the items of like amount in said table, and the differences between the dates in the table and those in the Maine treasury are accounted for by the difference in time between the drawing of the warrant- by the Treasurer of the United States and the receipt of the funds by the treasurer of Maine.
“On March 18, 1867, the date of the receipt by Maine of the payment of $184,462.12 made by the United States, there was due Maine a balance of $64,387.28 in addition to the $636,537.79 above mentioned as allowed by the Treasury Department, which said balance of $64,387.28 is determined thus: Claims filed by Maine in 1862 and 1863 were allowed by the United States to the amount of $917,539.68 (Table I), of *547 which there was paid by Maine the allowed sum of $636,537.79 from the proceeds of the $800,000 bonds as above stated. This left a balance of allowed claims amounting to $281,001.89, and this, deducted from the $320,000 paid by the United States to Maine (first two items Table 11), left a credit balance of $38,998.11; but Maine filed a further claim, which was allowed, to the amount of $103,385.38 (item 4, Table I), from which subtract said credit balance of $38,998.11, and there is left the balance of $64,387.28 claimed by Maine as aforesaid. The same result is reached by adding said $281,001.89, balance allowed claims, and the further allowed amount of $103,385.39, and from their sum ($384,387.28) subtracting said $320,000, which leaves the samé balance of $64,387.28 first above mentioned. .
“On September 19, 1868, Maine received from the United States a payment of $127,473.34, which is the item-appearing in Table II under date of September 5, 1868.
“On October 29, 1868, Maine received from the United States a payment of $6,728.96, which is the item appearing in Table II under date of October 16, 1868, and it was in payment of a claim by Maine for that amount filed with the Treasury Department August 8, 1868, the same being item 5 of Table 1, and it covers charges not included in any item of payment heretofore mentioned.
“ Upon the foregoing findings the State of Maine claims as per the following statement and figures furnished by counsel for claimant, all the computations of which I find to be correct:
“ Statement of amount claimed 'by the Slate of Maine to reimburse it for interest paid on moneys borrowed and expended for the United Stales.
Of the §250,000 borrowed May 10, 1861, the State expended §208.265.91 for purposes which the Government allowed as proper charges.
Interestoii S208,265.91, May 10, 1861, to June 30, 1862... §14,231. 50 Of the §300,000 borrowed July 1, 1861, the State expended §214,338.44 for purposes -which the Government allowed as proper charges.
Interest on §214,338.44, July 1, 1861, to June 30, 1862_ 12,860.31
Of the §250,000 borrowed August 1, 1861, the State expended §213,933.44 for purposes which the Government allowed as proper charges.
Interest on §213,933.44, August 1, 1861, to June 30, 1862. 11,766.34
Expenditures for allowed items as follows:
May 10, 1861. §208,265.91
July 1,1861. 214,338.44
August 1,1861. 213,933.44
Total. 636,537. 79
Total interest on same to June 30,1862. 38,858.15
*548 June30,1862, Maine received from the United States §357,702.10 (being its quota of the direct tax assumed by it and due that day), which, deducted from the above total of allowed items, leaves a balance of §278,835.69 unpaid and upon which the State was paying interest.
Interest on this balance, June 30, 1862, to March 18, 1867. §78, 910.50 March 18, 1867, Maine received from the United States payment of §184,462.12. At that time Maine had expended for the United States for allowed items, all subsequent to those making up the §636,537.79 and in excess of the §200,000 and §120,000 advanced it in 1861 and 1862, the sum of §64,387.28, for which it reimbursed itself, leaving §120,074.84 to be applied in reduction of the amount on which it was paying interest for the United States. (§184,462.12 less §64,387.28 leaves §120,074.84.) The §120,074.84 deducted from the former balance of §278,835.69 leaves §158,760.85 outstanding March 18, 1867.
Interest on this sum, March'18, 1867, to April 22, 1867 ... 899. 64
April 22, 1867, the State received §10,000 from the United States, which, deducted from the former balance, leaves §148,760.85 outstanding, on which the State was paying interest for the United States.
Interest on this sum, April 22,1867, to November 29,1867. 5, 380.18
November 29, 1867, the State received from the United States §10,682.23, which, deducted from the former balance, leaves §138,078.62 outstanding, on which the State was paying interest for the United States.
Interest on this sum, November 29, 1867, to December 16,
1867 . 391.22
December 16, 1867, the State received §4,000 from the United
States, which, deducted from the former balance, leaves §134,078.62 outstanding, on which the State was paying interest for the United States.
Interest on this sum, December 16, 1867, to September 19,
1868 . 6,100.58
September 19, 1868, the State' received §127,473.34 from the
United States, which, deducted from the former balance, leaves §6,605.28 outstanding, on which the State was paying interest for the United States.
Interest on this sum September 19, 1868, to May 10, 1871, the date on which the first issue of bonds became due
and was paid. 1,046. 93
Total interest paid out by the State upon moneys borrowed and used for the United States (one hundred thirty-one thousand five hundred eighty-seven dollars and twenty cents). 131,587. 20
Mem. — October 29, 1868, the State received from the United States §6,728.96_, to reimburse it for expenditures made for war purposes, but this was in payment of a claim of like amount filed August 8, 1868, and allowed by the Government, which said claim was for expenditures in addition to and not included in any of the allowances previously made and above referred to. This paying, having been made in settlement of the specific claim referred to, has no effect upon the above claim for interest.
“ By mutual agreement and request of counsel for the United States and for claimant the auditor further reports as follows:
“Under the act of July 27, 1861, the State of Maine filed with the Secretary of the Treasury of the United States six *549 accounts dated, respectively, April 25, 1862, July 28, 1862, July 22, 1863, February 25,1867, August 8, 1868, and June 19, 1882, on which the Treasury Department allowed and disposed of Si,027,654.03, and none of said accounts contained the present claim.
“The present claim was filed with the Secretary of the Treasury of the United States April 16, 1898.
“Immediately after the act of July 27, 1861, the Treasury Department established a rule rejecting all claims like this one on the ground that the same were for interest, and that the Government is not liable for interest unless expressly provided for in the contract. And the Attorney-General of the United States, to whom was referred a like claim of the State of New York, on July 23, 1883, rendered an opinion sustaining the Treasury Department rulings on the ground that such claims were for interest and not for principal.
“The Treasury Department continued to rule as aforesaid on all such claims presented up to and including the year 1896, when the Supreme Court of the United States, in New York v. United States (160 U. S. R., 598), held that claims of the nature of this one are for principal and not interest.
“Among the claims which the Treasury Department ruled as above stated were those of the States of New York and Indiana.
“Consistently with all such rulings this claim of Maine would not have been favorably considered by the Department if it had been filed at any time prior to the above-mentioned decision of the Supreme Court in 1896.
“Maine presented this claim to the Secretary of the Treasury for audit and payment within a reasonable time after said decision by the Supreme Court.
“All the evidence that ever existed and that could be used on behalf of either the Government or the claimant with reference to this claim was on said April 16, 1898, the date on which the claim was filed with the Secretary of the Treasury, and still is, accessible to the Government, and no detriment has accrued to the United States by reason of this claim not being filed prior to said April 16, 1898. '
' “ By request of counsel for the claimant the auditor reports that the law and method of taxation in Maine in 1861, 1862, and 1863 were that the legislature then assembled on the first Wednesday of January in each year, and each session provided for the annual appropriations and for the levying of the yearly State tax, which tax was legally due upon the first day of the January next following, and ordinarily was not actually received into the State treasury until from time to time during the ensuing year.
“Respectfully submitted November 29, 1899.
Harry M. Cavis, Auditor.”
*550 As will be noted in the auditor’s report of the facts found by him, the present claim was not presented to the Treasury Department for settlement until April, 1898, after the decision in the case of the United States v. New York (160 U. S. R., 598). The reason given why the claim was not presented to the Treasury Department prior thereto is that the accounting officers had rejected like claims on the ground that they were for interest, and were not, therefore, a part of the expenses properly incurred in the raising of troops under the act of 1861 (supra). And that ruling was afterwards sustained in an opinion by the Attorney-General. (17 O. A. G., 595.)
By the mistaken ruling of the accounting officers in so rejecting similar claims as for interest the claimant was misled, and by her silence acquiesced therein; but after the Supreme Court, in the case of the United States v. New York, held that interest paid on money borrowed to aid in equipping troops under the act of 1861 became a part of the principal sum “ as between the State and the United States,” she with diligence presented her claim.
The Supreme Court in the New York Case held—
“That the only inquiry is whether, within the fair meaning* of the latter act, the words ‘ costs, charges, and expenses properly incurred’ included interest paid, by the State of New ■ York on moneys borrowed for the purpose of raising, subsisting, and supplying troops to be employed in suppressing the rebellion. We have no hesitation in answering this question in the affirmative. If that State was to give effective aid to the General 'Government in its struggle with the organized forces of rebellion it could only do so by borrowing sufficient money to meet the emergency; for it had no money in its treasury that had not been specifically appropriated for the expenses of its own government. It could not have borrowed money any more than the General Government could have • borrowed money, without stipulating to pay such interest as was customary in the commercial world. Congress did not expect that any State would decline to borrow and await the collection of money raised by taxation before it moved to the support of the nation. It expected that each loyal State would, as did New York, respond at once in furtherance of the avowed purpose of Congress, by whatever force necessary, to maintain the rightful authority and existence of the National Government. We can not doubt that the interest paid by the State on its bonds, issued to raise money for the purpose expressed *551 by Congress, constituted a part of the costs, charges, and expenses properly incurred by it for those objects.
‘‘Such interest, when paid, became a principal sum, as between the State and the United States — that is, became a part of the aggregate sum properly paid by the State for the united States. The principal and interest, so paid, constitutes a debt from the United States to the State. It is as if the United States had itself borrowed the money through the agency of the State. W e therefore hold that the court below did not err in adjudging that the $91,320.84 paid by the State for interest upon the bonds issued in 1861 to defray the expenses to be incurred in raising troops for the national defense was a principal sum which the United States agreed to pay, and not interest within the meaning of the rule prohibiting the allowance of interest accruing upon claims against the United States prior to the rendition of judgment thereon.”
The claim in that case was transmitted to the court by the Secretary of the Treasury under Revised Statutes, section 1063, and the claim having been filed in the Department within six years after it accrued, such filing saved it from the bar of the statute of limitations, and the court adjudicated the claim on its merits. Or, as was said by the court in that case after commenting on the cases of United States v. Lippitt (100 U. S. R., 663); Finn v. United States (123 U. S. R., 227), and De Arnaud v. United States (151 U. S. R., 483):
“Upon the authority of those cases we adjudge that as the claim of New York was presented to the Treasury Department before it was barred by the limitation its transmission by the Secretary of the Treasury to the Court of Claims for adjudication was only a continuation of the original proceeding commenced in that Department in 1862. The delay by the Department in disposing of the matter before the expiration of six years after the cause of action accrued could not impair the rights of the State. Of course, if the claim had not been presented to the Treasury Department before the expiration of that period, the Court of Claims could not have entertained jurisdiction of it.”
The distinction between that section and section 2 of the act of 1888 is that in the former the court can proceed to determine the claim to judgment, while in the latter the court is required to find the facts and conclusions of law and report the same, together with its opinion, to the Department from whence it came “for its guidance and action.”
By section 13 of the act of March 3, 1887, known as the *552 Tucker Act (24 Stat. L., 505), it is provided, where a claim has been transmitted to the court under section 2 of the act of 1883, that “if it shall appear to the satisfaction of the court, upon the facts established, that it has jurisdiction to render judgment or decree thereon under existing laws, or under the provisions of this act, it shall proceed to do so.”
Section 1069 provides in substance that claims against the United States, cognizable bjr this court, “shall be forever barred” unless filed within six years after the claim first accrued. And in the construction of that section the court, in the case of Finn v. United States (supra), ruled that-“a judgment in the Court of Claims for the amount of a claim, which the record or evidence shows to be barred bjr the statute, would be erroneous. ” Such was the decision also in the case of De Arnaud v. United States (supra).
The claim in this action not having been filed in the Department within six years after it first accrued, section 13 of the act of 1887 has rio application, and the court is without jurisdiction to determine the claim to judgment. But inasmuch as the claim is one which the Department had jurisdiction to settle, it was properly referred, under section 2. of the act of 1883, and this court has jurisdiction to find the facts and to make its conclusions of law thereon for the guidance and action of the Department.
There is no general statute of limitations which operates against the accounting officers in the settlement of claims against the Government (Waddell v. United States, 25 C. Cls. R., 325, 328), nor is there any provision in the act upon which this claim is founded, or in any special statute inhibiting the accounting officers from taking jurisdiction of and settling the claim on its merits, unless the claim has been settled or is a stale claiiu.
Prior to the decision in the New York Case the claim now asserted existed, it was believed, only as a claim for interest, and as such was not presented to the Department, though the principal sum upon which it is founded was presented and paid.
The doctrine of ■ res judicata, while conducive to peace in ending litigation, has no application except in cases where it appears “by the record of the prior suit that the particular *553 controversy sought to be concluded was necessarily tried and determined — that is, if the record of the former trial shows that the verdict could not have been rendered without deciding the particular matter, it will be considered as having settled that matter as to all future actions between the parties; and, further, in cases where the record itself does not show that the matter was necessarily and directly found by the jury, evidence aliunde consistent with the record may be received to prove the fact.” (Packett Company v. Sickles, 5 Wall., 580, 592.)
The allowance of the claim by the Department having juris-, diction thereof is not in the nature of a judgment, but the law is well settled “thatpublic officers can not open and reexamine cases decided by their predecessors except for fraud, mistake in matters of fact arising from errors in calculation, or newly discovered material evidence. (Waddell v. The United States (supra) and cases there cited, among which is the well-known case of United States v. Bank of Metropolis, 15 Pet., 397, 401, where the court says: “This right in an incumbent óf reviewing a predecessor’s decision extends to mistakes in matters of fact arising from errors in calculation, and to cases of rejected claims in which material testimony is afterwards discovered and produced.”
The claim for the principal sum having been settled and paid over thirty years ago, that settlement became res judicata, and the accounting officers were, therefore, without authority to open and review that decision unless the decision of the Supreme Court in the Neto York Case, overruling them, was authority for such review, about which we express no opinion, it not being necessary to this case, as the Department had the unquestioned right to transmit the case to the court for its findings and opinion; so we will assume that the State’s only remedy, except by petition to Congress, was by the filing of a separate claim in the Department, as she has done.
From the authorities cited it seems clear to us that the claim so asserted, and which is sought to be concluded, was not as a matter of fact or law “so intimately connected with the principal claim already allowed that the interest claim can be held to have been settled in the settlement of the principal claims.”
*554 If the present claim was before the Department by virtue of tbe presentation of the principal claim, then in law it is still pending there undisposed of, as no action has been taken thereon, otherwise than in the allowance of the principal claim; and if rejected by virtue of the allowance of the principal claim, it was as interest and not as a part of the principal sum expended in the payment of costs, charges, and expenses properly incurred within the meaning of the act of 1861 as construed by the Supreme Court in the New Yo'rlc Case.
But our conclusion is that the claim was never presented either in fact or law to the Department until after the decision in the New YorJc Case.
We are aware of the rule both at common law and in equity which forbids the splitting of a claim or demand arising out of a single transaction and maintaining thereon two separate suits without the defendant’s consent. (Baird v. The United States, 96 U. S. R., 430, 432; Warren v. Cormings, 6 Cush. (Mass.), 103; Secor v. Sturgiss, 16 N. Y., 548.)
The best test of entirety, perhaps, is “whether the same evidence is necessary to support all branches of the claim. ” (Crips v. Talvande, 4 McCord (S. C.), 20.)
In the case of Bartell v. Schell (16 Fed. Rep., 341, 344) it was said:
“The doctrine of the Federal courts is that the estoppel extends to the matter in issue or points in controversy, upon the determination of which the finding or verdict was rendered; not as to all matters which might have been but were not liquidated.”
The authority for that' statement is found in the case of Cromwell v. County of Sac (94 U. S. R., 351, 353), where the court, in speaking of the operations of a judgment as an estoppel said:
“In all cases,-therefore, where it is sought to apply the estoppel of a, judgment rendered upon one cause of action to matters arising in a suit upon a different cause of action, the inquiry must always be made as to the point or question actually litigated and determined in the original action, not what might have been thus litigated and determined. Only upon such matters is the judgment conclusive in another action.”
*555 “And, further, quoting from Lord Ellenborough in bis opinion in the case of Outram v. Morewood (3 East, 346), the court said:
“ It is not the recovery, but the matter alleged by the party, and upon which the recovery proceeds, which creates the estoppel. The recovery of itself in an action of trespass is only a bar to the future recovery of damages for the same injury; but the estoppel precludes parties and privies from contending to the contrary of that point or matter of fact, which, having been once distinctly put in issue by them or by those to whom they are privy in estate or law, has been, on such issued joined, solemnly found against them.”'
If the United States had borrowed money from the State at a given rate of interest with which to equip the troops she raised, then there could be no question but that such claim would have arisen out of a single transaction. But the State’s financial condition compelled her to issue bonds upon which to raise money, and in doing so she obligated herself to pay a reasonable rate of interest. The money thus realized was expended in equipping troops, while the interest on the money so borrowed was paid to the bondholder.
The two sums of money were not contemporaneous; each constituted a separate charge made for and on behalf of the United States. The principal sum was expended before any interest was paid thereon, and at that time constituted unquestionably a separate charge against the United States; and while at the time it was presented both expenditures might properly have been included in'one account, so far as the interest had been paid, yet under the circumstances of this case, especially in view of the relations of the two sovereignties, we think the present claim was not concluded by the action of the accounting officers or by the failure of the claimant to include the interest charge with the claim so filed and settled.
That the claimant was, in fact, misled by the mistaken action of the accounting officers in rejecting like claims as interest there can be no question. Shall the State be held to. have been negligent in not presenting her claim when to have done so would have been useless ? That is to say, can the State be 1 held to have been negligent for failing to do a useless thing? We think not. Yoes’s Case (31 C. Cls. R., 293).
If what we have said be correct, then we have gone far *556 toward answering the question as to whether the present is a stale claim, and whether the State by her acquiescence in the ruling of the Department, until overruled in the New York Case, has been guiltyof such inexcusable laches as to deprive her of the aid of the court within the rule announced in the case of Speidel v. Henrici (120 U. S. R., 377, 387), where, in speaking of the right of a cestui que trust to maintain an action against one holding a fund in trust for the common benefit of members living together as a community, after such suitor had removed from the community and remained away for fifty years without taking any steps to assert an interest, the court said:
‘‘Independently of any statute of limitations, courts of equity uniformly decline to assist a person who has slept upon his rights and shows no excuse for his laches in asserting them. ‘A court of equity,’said Lord Camden, ‘has alwajTs refused its aid to stale demands, where the party slept upon his rights, and acquiesced for a great length of time. Nothing can call forth this court into activity but conscience, good faith, and reasonable diligence; where these are wanting, the court is passive, and does nothing. Laches and neglect are always, discountenanced, and therefore, from the beginning of this jurisdiction, there was always a limitation to suits in this court.’ (Smith v. Clay 3 Bro. Ch., 610, note.) This doctrine has been repeatedly recognized and acted on here. (Piatt v. Vattier 9 Pet., 405),” and numerous other authorities there cited, including the case of Godden v. Kimmel (99 U. S., 201).
However, the question of whether a claim should be held barred by reason of laches must depend upon the circumstances of each particular case, and be determined after considering all the elements which affect that question. (Twin Lick Oil Co. v. Marbury, 91 U. S. R., 587, 591; Sullivan v. Portland R. R. Co., 94 U. S. R., 806; Townsend v. Vanderwerker, 160 U. S. R., 171; Life Insurance Co. v. Austin, 168 U. S. R., 685, 699. See also thé case of Pike v. Martindale, 91 Mo., 268, 285; Brown v. County of Buena Vista, 95 U. S. R., 157, 160; Balmer v. United States, 26 C. Cls. R., 82, 91. -
There is no contention that, bjr reason of the lapse of time, the transactions have become obscure or that there is any loss of evidence. On the contrary, the evidence-available when *557 the claim for the principal sum was filed is still intact in the archives of the claimant, and upon this the auditor of the court bases his report herein.
In the case of Waddell v. United States (25 C. Cls. R., 323, 328) the court said:
“A stale claim is one that has not been presented-for payment for a long period of time, during- which the claimant has slept upon his rights and thus created a presumption that the claim was never an honest and just one, and that he has been waiting until it was forgotten by the alleged debtor, and all evidence against it is lost or destroyed.”
As we have seen, that definition does not apply to the present claim.
In that same case the court further said:
“ But there is much indebtedness of the United States which no lapse of time in making application for payment renders stale, such as interest on registered bonds and other balances stated in favor of parties on the books of the Treasury Department, as to which the only proof to be made is the identity of the claimant or his right to represent the record creditor.”
That statement was based on Revised Statutes, sections 306, 307, and 308. And later, in the case of Wayne, administrator, v. United States (26 C. Cls. R., 274, 289), referring to the Waddell Case (supra), the court said:
“We now hold that the statute of limitations does not run against outstanding liabilities so entered on the books of the Treasury Department, for which there is a permanent appropriation and other provisions by Revised Statutes * * * until the outstanding drafts, etc., are presented or demand is made without the draft and its nonproduction is properly accounted for. The case can not be distinguished in principle from that of Taylor (104 U. S. R., 216), affirming the judgment of this court (14 C. Cls. R., 339).”
While the claim in this suit was not entered or borne upon the books of the Treasury Department, the act of 1861 authorized the creation of the debt and carried with it an appropriation to pay “ out of any money in the Treasury not otherwise appropriated” * * * “the costs, charges, and expenses properly incurred;” and certainly a debt thus created should be held as sacred as though it were borne upon the books of the Department. The appropriation therein provided for continued until repealed by the appropriation Act of July 112, *558 1870, section 4 (16 Stat. L., 250), not, however, to take effect until after June 30, 1871, and after the claim in this action had accrued.
In the case of United States v. Kirkpatrick (9 Wheat., 720, 735) the court, speaking bjr Mr. Justice Story, in reference to the United States, said:
“The general principle is that laches is not imputable to the Government; and this maxim is founded, not in the notion of extraordinary prerogative, but upon a great public policj”. The Government can transact its business only through its agents; and its fiscal operations are so various, and its agencies so numerous and scattered, that the utmost vigilance would, not save the public from the most serious losses if the doctrine of laches can be applied to its transactions. It would, in effect, work a repeal of all its securities.”
The rule thus announced has been many times followed by the Supreme Court, some of the later decisions being United States v. Thompson (98 U. S. R., 486); Steele v. United States (113 U. S. R., 128); United States v. Beebe (127 U. S. R., 338), and. United States v. Insley (130 U. S. R., 263). There are, however, some exceptions to the rule thus announced. In the case of Cooke et al. v. United States (91 U. S. R., 389, 398) the court, in speaking of the liability of the Government for the laches of its officers, said:
“Laches is not imputable to the Government in its character as sovereign by those subject to its dominion. (United States v. Kilpatrick, 9 Wheat., 735; Gibbons v. United States, 8 Wall., 269.) Still, a government maj^ suffer loss through the negligence of its officers. If it comes down from its position of sovereignty and enters the domain of commerce, it submits itself to the same laws that govern individuals there. Thus, if it becomes the holder of a bill of exchange, it must use the same diligence to charge the drawers and indorsers that is required of individuals; and if it fails in this, its claim upon the parties is lost. (United States v. Barker, 12 Wheat., 559.) Generally, in respect to all the commercial business of the Government, if an officer specially charged with the performance of any duty, and authorized to represent the Government in that behalf, neglects that duty and loss ensues, the Government must bear the consequences of his neglect. But this can not happen until the officer specially charged with the duty, if there be one, has acted or ought to have acted. As the Government c,an only act through its officers, it may select for its work whomsoever it will, but it must have some representa *559 tive authorized to act in all the emergencies of its commercial transactions. If it fail in this, it fails in the performance of its duties and must be charged with the consequences that follow such omissions in the commercial world.”
In the case of Wisconsin Central Railroad Company v. United States (164 U. S. R., 190, 210) it was said:
“As a general rule, and on grounds of public policy, the Government can not be bound by the action of its officers, who must be held to the performance of their duties within the strict limits of their legal authority, where by misconstruction of the law under which they have assumed to act unauthorized payments are made.”
And thus the court, in that case, ruled “that parties receiving moneys illegally paid by a public officer are liable aequo et lono to refund them.” (See also Whiteside v. United States, 93 U. S. R., 247; Hawkins v. United States, 96 U. S. R., 689.) That holding materially modifies the well-known rule that as between individuals money paid in mistake of law can not be recovered back. The ruling is based upon the theory that the Government should not suffer for the illegal acts of its officers, and if not, then should the State in her dealings with the greater sovereignty because some one of her officers mistook her legal rights and thereby omitted to discharge his duty? A citizen of the State would not be permitted to shield himself behind the negligence of one of her • officers and thereby avail himself of it as. a successful defense in an action against him. (The County of Schuylkill v. The Commonwealth, 36 Penn. St., 524, 536; Looney, Supervisor, v. Hughes et al., 26 N. Y., 514, 519.) Ór, as was said by the court in the case of United States v. Thompson (supra), concerning the laches of a public officer:
“When the colonies achieved their independence, each one took these prerogatives, which had belonged to the Crown; and when the national Constitution was adopted, they were imparted to the new Government as incidents of the sovereignty thus created. It is an exception equally applicable to all Governments.”
However, we do not rest our decision on the theory that as between the United States and a State laches may not be imputed to the latter, but rest it on all the facts and circum- ° stances of the case.
*560 Thus, reviewing the authorities, how stands the case? The Congress enacted a law directing the Secretary of the Treasury to pay to the governor of any State, out of any money in the Treasury not otherwise appropriated, “the costs, charges, and expenses properly incurred by such State for enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops employed in aiding to suppress the present insurrection against the United States.” And thereafter, March 8, 1862, by resolution, declared that “the said act shall be construed to apply to expenses incurred as well after as before the date of the approval thereof.”
The legislature of the State of Maine convened in January, 1861, and, after making provisions for the State government, adjourned March 16 thereafter. But when the first call was made by President Lincoln for troops to aid in the suppression of the rebellion, the legislature was convened in extra session on April 22, and passed an act authorizing the governor to raise and equip ten regiments, and appropriated a million dollars therefor, and authorized a loan of a like amount to provide for said appropriation. In accordance with the act the loan was made for ten years by the issuance of bonds in installments' — that is, $250,000 May 10,1861, $300,000 July 1, 1861, and $250,000 August 1, 1861, or in all $800,000, at 6 per cent interest per annum, which was the legal rate in the State at the time and was reasonable. And but for the payments made to her by the United States of $200,000 September 2, . 1861, and $120,000 January 14, 1862, in payment of expenses incurred by her, she would have been compelled to borrow the full limit of the million dollars authorized.
The State in good faith expended the money so borrowed, and the sole and only controversy prior to the decision in the New Yorlt Case was that the money paid out as interest on money borrowed should be treated as interest, and not as part of the principal sum so expended for costs, charges, and expenses properly incurred.
By the action of the accounting officers the claimant was misled and, mistaking her legal rights, acquiesced in the . ruling of the Department. But it has been held in equitable cases that “ignorance of the law will excuse delay though it would not toll the statute of limitations, because equity can con- *561 sicler the moral aspect of an excuse.” (Cramer v. McSwords, 24 W. Va., 594.) And even mistakes of fact or law, it has been held, will sometimes keep the statute from running. (Tompkins v. Hollister, 60 Mich., 470.) In other words, the question of delay or laches as a defense is for the court to determine from all the circumstances of the case.
The claimant in this case,.a sovereign State, came to the rescue of the General Government in a critical time by invitation of the act of Congress referred tor under promise of indemnity for expenses properly incurred by her in arming troops for the defense of the United States, and justice between two sovereignties requires that legal technicalities be brushed aside and that the accounting officers adjust the account between the two Governments as they would have done had the law of the case been then known as it has since been declared to be.
In our view of the case we need not consider the question as to whether the bonds were issued for a reasonable time. "W e merely note the date of the issue of the several installments of bonds as stated and compute the interest from that date, on the amount thereof found to have been properly expended on behalf of the United States, up to the dates of the several payments made by the United States, giving them credit for <¡¡>357,702.10, the amount of direct tax chargeable against the State under the Act of August 6,1861, sections 8, 51, and 53 (12 Stat. L., 292, etc.), as of the date when the same became due and chargeable, to wit, June 30, 1862, though, as appears from the auditor’s report, the same was not charged off by the United States until September 2,1867. The State, however, should neither suffer nor profit by reason of the neglect of the United States to give her credit for the amount of such tax as of the date when it became due and chargeable, especially as there were filed in the Treasury Department April 25, 1862, claims in favor of the State for the expenditures so made by her aggregating over a million dollars; and besides, the amount of taxMue the United States was evidently taken into account by the State, as she gave .credit therefor to the United States as of June 30, 1862, as. shown by the findings.
*562 The United States are in no condition to complain because the State did not see fit to provide a tax levy to meet the expenditures as the}^ occurred; or, as was said by the Supremo Court in the New Yorlt Case,
“Congress did not expect that any State would decline to ' borrow and await the collection of money raised by taxation before it moved to the support of the nation. It expected that each loyal State would, as did New York, respond at once in furtherance of the avowed purpose of Congress, by whatever force necessary, to maintain the rightful authority and existence of the National Government.”
This the State did, but, with a treasury unprovided for such an emergency, her legislature was convened in extra session and a loan was authorized to carry out the will and purpose of Congress to aid in suppressing the rebellion, and good faith requires that the obligation of the National Government be made good, though the officer of the State, whoso duty it was to present the present claim, mistook her legal rights or was misled by the adverse ruling of the Treasury Department on like claims.
No presumption of bad faith can be imputed to the State by reason of the delay, even if the delay is not excused by the adverse ruling of the accounting officers on like claims, as the evidence available when the claim first arose is still intact and the United States have been benefited rather than harmed by the delay.
We therefore conclude:
1. That the present claim was not included in the claim presented to the Treasury Department for the principal sum, and was not settled therewith, and therefore the claimant is not concluded thereby.
2. That under the circumstances of this case no laches can be imputed to the claimant, and therefore the claim now asserted is not a stale claim or barred in the Treasury Department by an}' statute of limitations.
3. That the accounting officers have jurisdiction to settle the claim in this case, and the same should bo ad j usted by allowing the State interest, as set forth in the findings, from the dates of the several loans made by her on the money found to have been proporl}' expended in organizing and equipping the *563 troops, for wbicb the United States promised indemnity by the act of 1861, up to the date or dates when the Government reimbursed the State for the money so advanced, deducting therefrom the amount of direct tax charg-eable against said State as of the date when due and charg-eable, to wit, J une 30, 1862.
4z. That upon the theory and rule stated there is due the State for interest properly expended, as found and reported by the auditor of the court, the sum of <¡¡>131,587.20, which the Secretary of the Treasury has jurisdiction to settle under the provisions of the act of 1861 (supra).