Peelle, Ch. J.,
delivered the opinion of the court:
This is the claim of the State of Nevada for reimbursement under the act of July 27, 1861 (12 Stat. L., 276), for expenses claimed to have been “properly incurred by said State ” under said act in “ enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops employed in aiding in suppressing the present insurrection against the United States,” including interest paid for money borrowed to enable the State to meet its obligations under the act, as amended by the joint resolution of March 8, 1862 (12 Stat. L., 615), construing said act “to apply to expenses incurred as well after as before the date of the approval thereof.”
Said claim, to wit—
Abstract A.
1. Bounties paid to commanding officers of companies, $10 per capita for each recruit. $11, 840. 00
2. Publishing the governor’s proclamation for volunteers_ 146. 05
$11, 9SC. 05
*272 Abstract B.
Various expenses of the adjutant-general’s office, including rent, clerk hire, traveling expenses, stationery, furniture, and miscellaneous supplies, etc_ 3,114. 48
Abstract C.
Extra pay to Nevada volunteers_ 6. 054. 78
Abstract D.
Extra pay to Nevada volunteers_ 1,153. 75
Abstract E.
1. Salary of adjutant-general of State from January 7, 1862, to December 31, 1866_$6, 431.16
2. Contingent expenses of adjutant-general_ 1, 000. 00
- 7, 431.16
Abstract P.
Transportation of arms, blanks, and stationery. 60.00
119, 800.12
Abstract G.
1. Interest paid on $46,950.12 from February 10, 1865, to March 3, 1866, at 2 per cent per month (see Laws of Nevada, 1864-5, page 82, amended', see page 136, act of January 4, 1865)_ 11, 925. 33
2. Interest paid on $46,950.12 from March 3, 1866, to May 30, 1867, at 15 per cent per annum (see Laws of Nevada, 1866, page 47, act of January 19, 1866) _ 8, 744. 46
3. Interest paid on $119,800.12 from May 30,1867, to March 28, 1872, at 15 per cent per annum (see Laws of Nevada, 1867, pages 50 and 65, act of February 6, 1867)- 86,755.25
4. Interest paid on $119,800.12 from March 28, 1872, to January 1, 1883, at 91 per cent per annum (see Laws of Nevada, 1871, page 84, act of February 27, 1871)_ 122, 472. 33
5. Interest paid on $119,800.12 from January 1, 1883, to July 31, 1904, at 5 per cent per annum (see Laws of Nevada, 1877, page 191, act of March 8, 1877)_ 129, 276. 30
Total-47S, 973. 79
*273 -embracing all items accruing up to January 1, 1883, was presented to the Secretary of the Treasury January 13, 1888, apparently under the act of June 27,1882 (22 Stat. L., 111), as under that act there was allowed on Abstract A, $146.05; Abstract B, $2,878.13; Abstract E, $5,475.43; and Abstract F, $60; or,- in all, $8,559.61, leaving, as claimed, due and unpaid $470,414.18.
Subsequently said claim was, by the act of March 3, 1899 (30 Stat. L., 1206), “referred to the Secretary of the Treasury to investigate and report to Congress at the next session the amount furnished by said State of Nevada or by the Territory of Nevada and assumed by the State in aid of the suppression of the rebellion,” with the interest actually paid thereon.
Thereafter, under date of January 18 and June 8, 1900, the Secretary of the Treasury, in compliance with said act, reported to Congress his findings, showing that the amount, including interest expended up to June 30, 1889, was-$412,600.31, and that the amount subsequently paid, as shown by certificate of the state comptroller, if correct, was $58,401.27, of which amount the State was reimbursed April 8, 1888, $8,559.61, leaving $49,841.66, or expended in all, less said credit, as shown by his report, $462,441.97.
Thus the matter seems to have rested until the passage of the act of February 14,1902 (32 Stat. L., 30), making appropriations to pay the claims of the States of Maine, New Hampshire, Pennsylvania, and Rhode Island for expenses incurred by them, respectively, in which act, among other things, it was provided that the claims of like character arising under the act of July 27,1861, and the joint resolution of March 8, 1862 ( {supra), “as interpreted and applied by the Supreme Court of the United States in the case of the State of New York against the United States” (160 U. S., 598), “not heretofore allowed or heretofore disallowed by the accounting officers of the Treasury, shall be reopened, examined, and allowed, and if deemed necessary shall be transmitted to the Court of Claims for findings of fact or determination of disputed questions of law to aid in the settlement of the claims by the accounting officers.”
*274 What action, if any, was taken in the department under said act does not appear. But thereafter by the act of May 27, 1902 (32 Stat. L., 207, 235), making appropriation for the payment of certain claims, it was among other things provided “ That the claim of the State of Nevada for costs, charges, and expenses properly incurred by the Territory of Nevada for enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops employed in aiding to suppress the insurrection against the United States, war of 1861 to 1865, under the act of Congress of July 27, 1861 (12 Stat., 276), and joint resolution of March 8, 1862 (12 Stat., 615), as interpreted and applied by the Supreme Court of the United States in the case of the State of New York against The United States, decided January 6,1896 (160 U. S., 598), not heretofore allowed, or heretofore disallowed, by the accounting officers of the Treasury, shall be reopened, examined, and allowed, and if deemed necessary, shall be transmitted to the Court of Claims for findings of fact or determination of disputed questions of law to aid in the settlement of the claims by the accounting officers.”
Under that act, as well as under the act of February 14, 1902 (supra), the Secretary of the Treasury transmitted said claim to the court as involving controverted questions of fact and law. With his letter he transmits a communication to him from the Comptroller of the Treasury, in which, after setting forth the several claims, their origin and character, he submits to the court for its determination three questions as follows:
1. Under the act of February 14, 1902 (32 Stat. L., 30), what classes of expenditures should be allowed the State of Nevada, and in what amount?
2. Under the act of May 27, 1902 (32 Stat. L., 235, 236), what classes of expenditures should be allowed the State of Nevada, and in what amounts?
3. And in respect to the interest charges allowable under both acts, “What sums properly expended by the State or Territory of Nevada were paid by bonds or from funds realized from the sale of bonds, and what were the expenses in connection therewith and what interest was paid thereon? *275 In short, what was the total amount expended by the State in securing funds for expenditures properly incurred and paid?”
Questions 1 and 2, though referring to different acts of Congress, embracing the claims of the Territory, as well as the State of Nevada, are in legal effect the same, as each incorporates and makes part thereof the act of July 27, 1861, as interpreted by the Supreme Court in the case of the State of New York (supra), under which claim is made for reimbursement for expenses incurred under said act. Both acts operate to give the claimant a rehearing in the Treasury Department and a reinvestigation of its claim, and if deemed necessary by the Secretary, he is authorized by both acts to transmit the claim to the Court of Claims for findings of fact or determination of disputed questions of law, or both.
The third question embraces expenses alleged to have been properly incurred that were paid by bonds, or the proceeds arising therefrom, together with expenses in connection therewith and the interest paid on said bonds. However, whatever claims accrued in favor of the State or Territory of Nevada against the United States accrued, if at all, under the act of July 27, 1861, and not under either of the other acts mentioned, their office being as above mentioned, and to give the State the right to assert a claim for expenses likewise incurred by its predecessor, the Territory of Nevada, thereby placing the Territory on the same basis as the State in respect to such claim.
Counsel for the respective parties heretofore joined in a motion for the reference of the case to the auditor to examine and state the account between the United States and the State, and its predecessor, the Territory of Nevada, but action on said motion was suspended until the court had heard and considered the question of law involved under the reference, and for that purpose the motion was placed upon the Law Calendar. The case was heard on December 20, 1909, at which time not only the motion but the whole case was argued and submitted to the court.
We have then to consider whether the claims herein for reimbursement are properly chargeable against the United *276 States under the act of July 27, 1861, as amended by said joint resolution of March 8,1862 (supra).
The contention of the claimant is that the expenses incurred by the State were, in effect, in its sovereign capacity, though conceding its agency, and that the amount so expended, in the absence of fraud, is not subject to review by the accounting officers; while, on the other hand, the defendant’s contention is that the claimant, as State or Territory, in incurring the expenses to aid in suppressing the rebellion acted as the agent of the United States; and thus acting, the State was limited by the law the same as other agents or officers of the United States, and that therefore only such “ costs, charges, and expenses ” as were “ properly incurred ” by the State or Territory for the purposes set forth in said act are allowable.
The rules and regulations promulgated by Secretary Chase (afterwards Chief Justice of the United States) for the investigation and reimbursement of expenses under said act provide:

uBuies for the preparation and settlement at the Treasury Department, under acts of Congress approved July 17, 1861, and July 27, 1861, of claims for reimbursement of expenses properly incurred by the States, respectively, on account of their troops employed in aiding to suppress the present insurrection against the United States.

“I. Accounts, with vouchers for all expenditures made, must be presented to the Secretary of the Treasury, by whom they will be referred to the proper accounting officers for investigation and settlement. ‘
“ II. It is only for expenditures on account of troops, officers, or men that have been or may be mustered and received into, or actually employed in, the service of the United States that reimbursements will be made. Organizations raised, or attempted to be raised, but not mustered and received into, nor actually employed in, the service, will not be recognized. Nor will any reimbursement be made by the United States of expenses incurred in organizing, equipping, and maintaining troops for state purposes, or home guard, whether called out by state or other local authority, unless such troops were called out and such expenditures incurred at the request or undei the authority of the President or the Secretary of War.
*277 “III. Personal expenses of commissioned officers in recruiting their companies prior to their being mustered into service will not be allowed; but commissioned officers may be allowed the same rates for subsistence and quarters (board and lodging) as privates, from the date of enrollment until mustered into service. The necessary and actual traveling expenses of recognized military agents of the State, when accompanied by bills of particulars and receipts for payments, will be refunded.
“IV. Bills of particulars, with dates and rate of charge, and the receipt of the party to whom payment was made, must, in all cases, be furnished. It is not sufficient to show that a gross amount was expended, still less that sums were turned over to individuals to expend, without evidence showing that they were expended by them, and how they were expended. In short, original vouchers for expenditures of every description must be furnished. The expenditures should be classified, and separate abstracts, with the vouchers, presented for pay, subsistence, clothing, transportation, arms, and equipment, and other expenses; and they should also designate, as far as practicable, the particular regiment or corps on account of which the expenditure was incurred. Claims for pay of troops must be accompanied with complete pay rolls for each corps, properly certified and receipted, the same as are required in the regular service.
“V. Where subsistence in kind could not be furnished, and expenses were incurred for ‘ board,’ or ‘ board and lodging,’ the rates will depend on the section of country where furnished, and the price paid for complete rations at the nearest recruiting station or military post, and in no case will a higher rate be allowed than the amount actually paid. The bills must specify the regiment or company to which the troops so subsisted or quartered belonged, and that rations could not be procured. Bills for lodging will be restricted to cases where there were no tents, and quarters could not be otherwise obtained. Purchases of subsistence in bulk will be paid for at not exceeding the current prices at the place of purchase, provided that the quantities are in proper proportions, or reasonably so, to the number of men according to the rates of allowance in the Subsistence Department. The articles of subsistence must be such only as are recognized in the regular service, or, if other articles are substituted, the cost of the whole must not exceed the regular supplies. Bills for spirituous liquors, treating, expenses of holding elections for officers, will not be recognized or paid.
“VI. Transportation and quarters for troops at reasonable rates will be paid for. Transportation is restricted to *278 the usual routes and modes of conveyance, and excessive quantities will not be recognized. Wagon hire for the transportation of the men themselves will not be sanctioned. Charges for transportation by railroad or other public conveyance must be accompanied by bills of lading in cases of property or supplies; and for troops, the number of men ' with the regiment or corps must be distinctly set forth, and where the same has been done in pursuance of a contract, the contract must accompany the vouchers. The same provisions apply to transportation by vessel.
“ VII. Claims growing out of impressment of property or services, and for damages clone to individuals or their property, are not authorized to be paid. Provision for such claims must be made by special act of Congress, when not already provided for by general laws.
“VIII. Bounties or donations to men or their families to induce men to volunteer will not be recognized. Such bounties as may be authorized by law will be paid by the United States directly to the men authorized to receive them. Voluntary contributions, either by States or local corporations, or by individuals, in aid of families of volunteers, etc., constitute no charge against the United States, and will not be refunded.
“IX. Each State must present its full and final accounts for reimbursement, under the acts providing therefor, up to the date of the passage of said acts. The proper authorities of the State should certify over their official seals that the respective amounts claimed to be refunded have been actually paid by said State, and that no part thereof has been paid by any disbursing officer of the United States.
“Approved:
“ S. P. Chase,
“Secretary of the Treasury.”
The above rules, which we are advised have from the beginning been applied by the accounting officers, outline the departmental construction of the acts, with the execution of which the Secretary of the Treasury was charged, and as they appear to be 'in harmony with said acts, the construction given thereto must now be upheld, unless there is something in subsequent legislation or in the decision of the Supreme Court in the case of United States v. State of New York (160 U. S., 598) enlarging the liability of the United, States.
The act of June 27, 1882 (22 Stat. L., 111), authorizing the Secretary of the Treasury to examine and report to *279 Congress the amount of claims of Nevada and other States for money expended and indebtedness assumed by said States in repelling invasion and suppressing Indian hostilities between April 15, 1861, and the date of said act, is referred to by the comptroller in his communication to the Secretary transmitted to the court, and particular attention is invited to section 2 of this act, which in effect limits the rate allowed for the service of troops and for supplies, transportation, and other proper expenses that was allowed and paid by the United States for similar services of the same grade and for the same time in the United States Army serving in said States; and also limits the amount of such expenses of troops for the time they were engaged in active service in the field. But said act evidently has no direct application to the present claim and is not material in our view of the case.
The defendants call attention to the acts of August 4, 1886 (24 Stat. L., 217), and March 9,1899 (80 ibid., 120), the first of which provides for the use of certified copies as evidence of all original papers lost, and confers upon the Secretary of War authority to detail three army officers to assist in examining the claims of the States named in said act of June 27, 1882 (supra). The act of March 9, 1899, provides, as before stated, for the reference of the claim of Nevada to the Secretary of the Treasury for investigation and report to Congress. But neither of these acts in any way changes the liability of the United States as it previously existed under the acts of 1861 and 1862. Hence, as before stated, the sole question of law before the court is whether the expenditures for which claim is made by the State were “ properly incurred ” within the meaning of the acts of 1861 and 1862.
The question of the good faith of the State in incurring the expenditures for which it now claims reimbursement; the question of the pressing need of the State for troops during the period of the civil war; the duty of the United States to provide for the common defense, and the benefits which may have accrued to them from troops raised in Nevada to aid in protecting the Pacific coast, may all be conceded without enlarging the liability of the United States under the acts of 1861 and 1862. The commanding officer of the Department *280 of the Pacific, while he could execute the orders of the War Department in calling for troops, could not enlarge the liability of the United States under the acts of 1861 and 1862, whatever authority he may have had as such commander in emergencies independently thereof.
These acts, as held in the New York case (supra), must be given a liberal construction, not, however, such a construction ' as will defeat the manifest purpose of the acts which Congress, had in view. That is to say, Congress, by the language of the acts, intended to reimburse States for “ expenses properly incurred” in equipping troops to aid in suppressing the rebellion, reserving, however, to the Secretary and to the accounting officers of the Treasury the right to determine for themselves whether or not the expenses for which reimbursement was sought had been so incurred.
The claimant concedes that all disbursements embraced in its claim “were made pursuant to legislative acts,” and,-as it asserts, were passed at the instance of the military officer commanding the Department of the Pacific. It appears from the comptroller’s letter — not controverted by the claimant— that the enlisted men of Nevada for the years 1863, 1864, 1865, and 1866 received from the United States the full pay and allowances of regular officers and enlisted men of the United States Army for those years and presumably as well any bounty which may have accrued to them.
We think it manifest, from the language of the acts of 1861 and 1862 that in so far as the State responded to the proclamation of the President for troops it acted as the agent of the United States; and if so, it follows that the State could not bind the United States outside the terms of the statute under which it acted. The claimant concedes the agency of the State, but insists that it acted in some extraordinary way, being different from an ordinary agent or constitutional officer, and that, therefore, in the absence of fraud, its action is conclusive.
In the New York case (supra, p. 621), except as to the jurisdiction of the court to render judgment under Revised Statutes, section 1063, and the question of the statute qf limitation, neither of which is material in the present case, *281 but a single question was involved, or, as was said by the court, “ the only inquiry is whether, within the fair meaning of the latter act, the words ‘ costs, charges, and' expenses properly incurred’ included interest paid by the State of New York on moneys borrowed for the purpose of raising, subsisting, and supplying troops to be employed in suppressing the rebellion. We have no hesitation in answering this question in the affirmative.” Hence, the interest so paid was allowed not as interest, but, as the court held, because “ such interest, when paid, became a principal sum as between the State and the United States; that is, became a part of the aggregate sum properly paid by the State for the United States. The principal and interest so paid constitute a debt from the United States to the State. It is as if the United States had itself borrowed the money through the agency of the State.”
The court, in this case, also allowed interest on the money borrowed by the State from the commissioners of the canal fund which had been disallowed by the Court of Claims on the ground that the transaction was entirely between the different departments of the same government, which, in law, was the official act of the same political power; but the Supreme Court, treating it as a trust fund, held that the State should have invested the fund in securities for the benefit of the canal fund, and having diverted the fund to the uses of the United States in equipping troops, the State had therebjr deprived itself of the interest which might otherwise have been realized for the benefit of the canal fund, and for this reason the Supreme Court differed with the Court of Claims and allowed interest, charging against the fund, however, interest which the State had earned on a part of the fund so obtained from the canal fund. The decision of the court in the case of the State of Maine (36 C. Cls., 531, 561) followed that decision and is in strict accord therewith.
But in the New York case it should be borne in mind that the principal sum upon which interest was allowed had theretofore been audited and paid by the Treasury Department as “ expenses properly incurred by said State,” and for that reason the expenses for which said principal sum had been *282 incurred were not directly involved in that case, or, as was said by this court in the first paragraph of its opinion (26 C. Cls., 467, 489), “ The petition alleges that the defendants became indebted to the claimant, on the 1st day of July, 1862, for money laid out and expended to and for the use of defendants, at their request, in the sum of $3,131,188.02, and of this there has been paid the sum of $3,000,000, leaving a balance due the petitioner of $131,188.02,” which was the exact amount of the judgment in the case as modified by the Supreme Court. Hence that question is open, and until determined in the present case that the principal sum upon which interest is claimed was an expense “ properly incurred ” by the State, the New York case can have no application.
To hold that the questions involved were determined by the State, and therefore not subject to review, is to fly in the face of the statute under which the accounting officers have from the beginning exercised the right to examine into such expenditures and determine for themselves what costs, charges, and expenses has been properly incurred by each State, and to that end such costs, charges, and expenses are “ to be settled upon proper vouchers, to be filed and passed upon by the proper accounting officers of the Treasury,” as in said act provided. The duties thus to be performed', under the act and the rules prescribed by the Secretary of the Treasury, are of a quasi judicial character, as they are to determine whether the expenses for which claim for reimbursement is made were “properly incurred” and to settle the same upon vouchers to be passed upon by them.
If Congress had thought the action of the State in incurring the expenses was conclusive on the accounting officers and the courts they would have made an appropriation to pay the claim so reported to them by the Secretary of the Treasury under the act of March 3, 1899 (supra), instead of sending it back to him for further investigation or reference to the court.
Now, keeping in mind that the United States paid the troops of Nevada in 1863, 1864, 1865, and 1866 the full pay and allowances of regular officers and enlisted men in the United States Army, and presumably also any bounties that *283 may have accrued to them, let us inquire as to the character of the expenditures upon which interest is claimed. The items of the claim set forth show that the principal payments niade by the State were for bounties to commanding officers to secure enlistments and for extra pay to volunteers, upon which sum so paid interest is claimed from May 3, 1867, at rates varying, for different periods, from 5 to 15 per cent.
Of the other items mentioned in abstracts A, B, E, and F there was, as before stated, allowed under the act of June 27, 1882 (supra), by the Secretary of War, with the approval of the Treasury Department, the sum of $8,559.61, which was paid to the State April 10, 1888, leaving a balance due on abstracts B and E for various expenses and salary of the adjutant-general of said State of $2,192.08.
The allowance and payment, however, under said act of 1882, the claimant concedes was an inadvertence, as the act clearly applies to expenses incurred in repelling invasions and suppressing Indian hostilities, and was, as the claimant asserts, uniformly so interpreted by the accounting officers. But to the extent of the payment so made those items are out of the case, and whether any further payment shall be made thereon we remit to the accounting officers, suggesting that— in harmony with this opinion — whatever ruling has been applied under the acts of 1861 and 1862 in the settlement of like claims in favor of other States, not in conflict with the decision in the New York case, should be adhered to in any settlement made thereof with the claimant.
By the reimbursement act of July 8,1898 (30 Stat. L., 730), for expenses incurred by the governors of States and Territories in equipping troops for the Spanish war, it was expressly provided that any interest paid by any State or Territory on money borrowed or on sums paid out by them in equipping such troops should not be refunded or paid by the United States.
In view of the construction placed upon the act of 1861 by the Supreme Court in the New York case, supra, holding that interest paid by a State on money borrowed was an expense “ properly incurred,” the act of 1898 may well be considered, not as a limitation upon the payment of interest *284 on the principal sum expended under said act of 1861, but as in some measure showing the intention of Congress as to the character of expenditures upon which interest should be allowed.
The rules set out for the settlement of claims under the acts clearly indicate the character of claims which will be considered and those which will not be, and as well the method of the settlement of such claims by the accounting officers. And by rule 8 it is expressly provided that “ bounties or donations to men or their families to induce men to volunteer will not be'recognized,” doubtless for the reason, as therein stated, that “ such bounties as majr be authorized by laAv will be paid by the United States directly to the men authorized to receive them.” Thus we have not only a prohibition against the reimbursement of expenses for bounties or donations to induce enlistment, but we have the reason for it, and the reason itself negatives reimbursement for any such expense through the agency of the State. To overthrow the construction thus given to the act, which has been adhered to for nearly fifty years, would in effect be overruling the Supreme Court, in many cases holding that the contemporaneous construction of an act by an executive officer charged with its execution is entitled to great weight and should not be overthrown except for cogent reasons. (United States v. Tanner, 147 U. S., 661; United States v. Finnell, 185 ibid., 236; Penoyer v. McConnaughy, 140 U. S., 1.)
This view is not in conflict with the decision in the New Yorh case, nor is the decision in that case in conflict with the rules so prescribed for the adjustment of such claims. The difficulty grew out of a too narrow application of the rules by the accounting officers soon after the war in not allowing interest on a principal sum found by them to have been properly incurred. The act promised reimbursement to the State for expenses properly incurred, and that, under the act as well as the rules, carried with it interest as a necessary part of the outlay.
This regulation was not only justified by the act of 1861, but was in harmony with section 9 of the act- of August 3, 1861 (12 Stat. L., 288), whereby Congress abolished the *285 three months’ extra pay allowed by the act. of July 5, 1888, for reenlistments, as well as the bounty granted by the third section of the act of June 17, 1850 (9 Stat. L., 438), for enlistments at remote and distant stations and the premium paid for bringing accepted recruits to the rendezvous, and in lieu thereof enacted laws, too well known to cite, providing for bounties to encourage enlistments; but such bounties were paid by the United States directly to those entitled thereto and not through the medium or agency of the States under the reimbursement acts of 1861 and 1862.
Now, recurring to the claim in this case, men may be induced to volunteer by the promise of extra pay, as well as by the payment of direct bounties. And surely extra pay would fall under the head of bounty or donation to induce such enlistment. In other words, it is something additional to the regular pay and allowances authorized by Congress to officers and enlisted men in the army, and bounties to enlisted men, and, therefore, not an expense “properly incurred.”
That laws were enacted by the State at the instance of the officer commanding the military department of the Pacific to provide funds with which to meet the expense of volunteers was quite natural and commendable under the conditions existing there both to the officer and the legislature, and may give rise to some equity in favor of the claim; but that can have no legal force in the construction of the act of 1861. Equity is “the correction of that wherein the law by reason of its universality is deficient; ” but where there is a law equity must follow, and hence we are called upon to determine, not the equities of the claim, but the controverted questions of law.
It results that in respect to such bounties and donations the interpretation placed upon the acts of 1861 and 1862 by the Secretary of the Treasury — -now so long adhered to— must be upheld. Doubtless many, if not all, of the other Northern States offered bounties, donations, or extra pay to induce their citizens to enlist to fill up their respective quotas, called for from time to time by the President, but none of them, we are advised, have filed any such claim for *286 reimbursement, and even the present claim was not filed until after the act of June 27, 1882 (supra).
As to the interest claimed on $46,950.12, there is nothing in the record from which the court can determine the character of the expenses for which said principal sum was incurred, though from the claimant’s brief we infer that in some way it was incurred by the Territory of Nevada, but whether to pay expenses properly incurred or for bounties or otherwise-does not apppeaf.
If, however, said principal sum upon which interest is claimed has heretofore been allowed and paid by the accounting officers as an expense “properly incurred,” then, under the decision in the New York case, the State is entitled to interest thereon, which interest, when paid, “ became a principal sum, as between the State and the United States; that is, became a part of the aggregate sum properly paid by the State for the United States.”
The question as to the rate of interest was not involved in that case, but, as the State was compelled to borrow money, the court said: “ It could not have borrowed money, any more than the General Government could have borrowed money, without stipulating to pay such interest as was customary in the commercial world.” From that statement we may conclude that the court at the time had in mind the payment of such rate of “interest as was customary in the commercial world.” What that rate was is more familiar to the accounting officers than to the court, and as there is no evidence in the case upon which the court could base an opinion, other than the condition historically known to exist on the Pacific coast during the civil war and the rate paid by the United States, the court remits the question to the accounting officers, who, if any interest should be allowed on said sum of $46,750.12, can follow the New York case in applying the rates then customary in the commercial world.
It follows that the motion to refer the case to the auditor to state the account is overruled, and the case is disposed of on the merits for the guidance of the Treasury Department.
This opinion will be certified to the accounting officers for their guidance and action.