**174**

Plaintiff, however, says that article 10(e) of the contract for the construction at the United States Naval Air Station gave the contracting officer the authority to take possession of materials without taking title thereto, and it says that this is all the Government did. However, this article, in addition to giving the contracting officer authority to take possession of the materials, further provides, "The title to each item of materials, articles, and supplies passes to the Government when acceptance of title is authorized or approved by the Contracting Officer."

Since the purpose of the Government was to get the benefit of the land-grant rates, and since this could not have been accomplished except by the Government's taking of title to the articles before shipment, it must be assumed that it was the Government's intention, not only to take possession of the articles, but also to take title thereto prior to shipment. The consigning of the shipments to the officer in charge, and the payment of the freight charges by the Government is a clear indication that the Government considered the articles as its property.

We must conclude that the Government by its letter of July 27, 1940, intended to take title to the articles purchased.

The case of Kern-Limerick, Inc., v. Scurlock, 74 S.Ct. 403, lends some support to the above. That case involved the Government's right to exemption from a State sales tax where the materials to be used in the construction of an ammunition dump had been purchased by the contractors under a provision of the contract which made them the agents of the Government in so doing. The Court held that under the facts of that case, the Government was the purchaser, and, hence, the sale was not subject to the tax.

Plaintiff is not entitled to recover and, therefore, its petition is dismissed.

JONES, Chief Judge, and MADDEN and LITTLETON, Judges, concur.

**STATE OF CALIFORNIA**

**v.**

**UNITED STATES.**

No. 49912.

United States Court of Claims.

March 2, 1954.

Writ of Certiorari Denied June 7, 1954.

See 74 S.Ct. 864.

Phil D. Swing, San Diego, Cal., and Howard C. Ellis, San Francisco, Cal., for plaintiff. Edmund G. Brown, Martin J. Dinkelspiel, San Francisco, Cal., and Robert F. Klepinger, Washington, D. C., were on the briefs.

Carl Eardley, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for defendant. Ernest C. Baynard, Washington, D. C., was on the briefs.

Before JONES, Chief Judge, and LITTLETON, WHITAKER and MADDEN, Judges.

WHITAKER, Judge.

Plaintiff sues the defendant for $7,-561,508.15, money alleged to have been spent by it in the recruiting, equipping, and supporting of its volunteer forces, and in support of its militia, during the War Between the States, and for interest on its bonds which it sold to pay these expenses, and the discount at which these bonds were sold.

The case is brought under a special jurisdictional act, approved September 25, 1950, Public Law 834, c. 1027, 81st Congress, 2d Session, 64 Stat. 1032. It is necessary to quote the Act in full, since plaintiff's first contention is that this Act confesses liability for the expenditures made, and that it is only necessary for the court to determine the amount of the expenditures and to compute the interest thereon.

The first paragraph of the Act reads:

"That jurisdiction is hereby conferred upon the Court of Claims of the United States to hear and determine and render judgment on the claims, of the State of California, arising out of moneys allegedly advanced and expenditures allegedly made in aid of the United States during the War Between the States for such advances and expenditures, if any, in the manner hereinafter provided by this Act."

In the next paragraph the Act directs the court to include in its judgment, if any, the interest paid on the sums expended and also the loss on account of the discount at which the original bonds were sold and the premium on the new bonds for which the old bonds were exchanged. This paragraph reads:

"The court shall include in such judgment, if any, the interest which shall be proved to the satisfaction of the court as actually paid by the State of California on the sums so advanced and expended from July 1, 1889, to the date of enactment of this Act, and shall also add thereto the total loss which shall also be proved to the satisfaction of the court to have been suffered by the State of California occasioned by the discounts at which original bonds were sold and new bonds exchanged therefor as set forth in Senate Report 351, page 17, Seventy-second Congress, first session, which loss was not included in the accounting rendered by the Comptroller General on August 14, 1930 (Senate Document 220, Seventy-first Congress, third session), pursuant to S.Res. 277, Seventy-first Congress. The court shall deduct from such total sum any amounts repaid by the United States to the State of California since July 1, 1889."

The third paragraph sets out evidence which the court is authorized to consider in determining the amount of the advances and expenditures. It reads:

"In ascertaining and determining the aforesaid advances and expenditures, the court may receive and consider all papers, depositions, records, correspondence, and documents heretofore at any time filed in Congress, or with committees thereof, and in the executive departments of the Government, including the report of the Secretary of War made pursuant to Senate resolution of February 27, 1889, and printed in Senate Executive Document 11, Fifty-first Congress, first session, page 27, together with any other evidence offered."

The fourth paragraph waives the statute of limitations and laches. It reads:

"Judgment under this Act shall be allowed, notwithstanding the lapse of time, the bars or defenses of laches, or any statute of limitations."

The final paragraph provides for the time within which the suit must be instituted and for a review of the judgment rendered and for the payment of the judgment, if any. It reads:

"Suit under this Act shall be instituted within six months after enactment thereof. The judgment shall be reviewable by the Supreme Court in the same manner as other judgments rendered by the Court of Claims. Payment of such judgment shall be in the same manner as in the case of claims over which such court has jurisdiction as provided by law and shall constitute full and complete settlement of all claims or demands of any nature whatsoever arising out of the advances and expenditures referred to in this Act."

I

 On the question of whether or not this Act confesses liability, the first and fourth paragraphs are the most important. We quote again these two paragraphs, in part:

*"Be it enacted * * * That jurisdiction is hereby conferred upon the Court of Claims of the United States to hear and determine and render judgment on the claims, of the State of California, arising out of moneys allegedly advanced and expenditures allegedly made in aid of the United States during the War Between the States for such advances and expenditures, if any, in the manner hereinafter provided by this Act.*

\* \* \* \* \* \*

"Judgment under this Act shall be allowed, notwithstanding the lapse of time, the bars or defenses of laches, or any statute of limitations."

This Act follows the pattern of many jurisdictional acts conferring special jurisdiction on this court. It provides that we may "hear" the claim of the State of California, that we shall "determine" the claim, and "render judgment" on the claim. It then waives certain defenses which the Government would otherwise have the right to interpose, to wit, the defenses of laches and the statute of limitations.

We see nothing in these two paragraphs to indicate that Congress meant to confess liability. It recognizes that California has a claim against the United States, but it does not say whether or not this is a good claim. It authorizes us to hear the claim, and to "determine" it, which latter word means, as defined by Webster, "to settle a question or controversy about"; and after we have settled the controversy, then we are authorized to render judgment.

The Act recognizes that the defendant may have defenses to the claims, but some of these defenses it waives. It waives laches and the statute of limitations, but it says nothing about waiving other defenses.

The second paragraph is somewhat pertinent to this inquiry also. It starts out by saying the "court shall include in such judgment, *if any*, * * *." [Italics ours.] The phrase "if any" is a recognition by Congress that the court may not think that under the law and the facts it is its duty to render any judgment at all.

When the Act was passed, Congress was well aware that California had expended money in aid of the United States in the War Between the States. There had been a number of committee reports of both Houses of Congress setting out the expenditures California had made. The Comptroller General of the United States, under direction of Congress, had made an extended report setting them out. A Board of Army officers, appointed under an Act of Congress, had investigated California's claim and made an extended report on it. There could have been no doubt in the mind of any Congressman that expenditures had been made, and the approximate amount of them; and, yet, Congress in the jurisdictional act provided that the Court of Claims should include certain things "in such judgment, *if any*". [Italics ours.] Congress, therefore, recognized that we might be of the opinion that, although

expenditures had been made, still California was not entitled to a judgment.

This second paragraph then goes on to say that if we do decide that California is entitled to a judgment, we shall include in that judgment the interest it paid on the money borrowed to make these expenditures, and the loss which the State suffered through the necessity of selling its bonds at a discount; but, of course, this provision does not say that we are to allow this interest and discount if we think California is not entitled to a judgment. Interest is to be added only in the event that we should be of the opinion that the State is entitled under the law to recover for any of the sums expended.

In construing special jurisdictional acts, it is a well established rule that Congress is not presumed to have intended to do more than to afford a forum for the adjudication of a claim, and that it did not intend to confess liability unless that intention is expressed "in language not to be misunderstood." This was said as long ago as 1888 in United States v. Cumming, 130 U.S. 452, 455, 9 S.Ct. 583, 584, 32 L.Ed. 1029.

It was rather clear in that case that liability was not confessed, but plaintiff contended that it was, and in answer to that contention the Court said:

"A satisfactory answer to this suggestion is that if congress intended to do more than give the plaintiffs an opportunity, in an action for damages brought in the court of claims, to test the question as to the liability of the United States, upon the law and facts, for the alleged wrongs of their officers, that intention would have been expressed in language not to be misunderstood."

In United States v. Goltra, 312 U.S. 203, 210, 61 S.Ct. 487, 492, 85 L. Ed. 776, the Court said that jurisdictional acts "are to be strictly construed." In support of this statement it cites:

Dubuque & Pacific R. Co. v. Litchfield, 23 How. 66, 88, 16 L.Ed. 500; Slidell v. Grandjean, 111 U.S. 412, 437–438, 4 S. Ct. 475, 28 L.Ed. 321; Coosaw Mining Co., v. South Carolina, 144 U.S. 550, 562, 12 S.Ct. 689, 36 L.Ed. 537; Blair v. Chicago, 201 U.S. 400, 471; Charles River Bridge v. Warren Bridge, 11 Pet. 420, 544, 9 L.Ed. 773; also see Russell v. Sebastian, 233 U.S. 195, 205, 34 S.Ct. 517, 58 L.Ed. 912.

In United States v. Mille Lac Band of Chippewa Indians, 229 U.S. 498, 500, 33 S.Ct. 811, 812, 57 L.Ed. 1299, the contention was made that the special act confessed liability, but the Supreme Court said:

"The jurisdictional act makes no admission of liability, or of any ground of liability, on the part of the government, but merely provides a forum for the adjudication of the claim according to applicable legal principles. * * *"

The Act in that case, 35 Stat. 619, was quite similar to the one now under consideration. It read in part:

"* * * That the Court of Claims be, and it is hereby, given jurisdiction to hear and determine a suit or suits to be brought by and on behalf of the Mille Lac band of Chippewa Indians in the State of Minnesota against the United States on account of losses sustained by them or the Chippewas of Minnesota by reason of the opening of the Mille Lac Reservation in the State of Minnesota, embracing about sixty-one thousand acres of land, to public settlement under the general land laws of the United States; * * *"

The Court of Claims also has said many times that a jurisdictional act will not be construed to confess liability unless that intention is clearly expressed. Gregory v. United States, 57 F.Supp. 962, 102 Ct.Cl. 642, 657, certiorari denied 326 U.S. 747, 66 S.Ct. 26, 90 L.Ed. 447. (It is true two of the judges

of the court dissented in that case, but not on this point.) See also Zephyr Aircraft Corp. v. United States, 104 F. Supp. 990, 122 Ct.Cl. 523, 549, certiorari denied 344 U.S. 878, 73 S.Ct. 165, 97 L. Ed. 680; Hempstead Warehouse Corp. v. United States, 98 F.Supp. 572, 120 Ct. Cl. 291, 305; The Oyster Cases, (F. Mansfield & Sons Co. v. U. S.), 94 Ct.Cl. 397; Gates v. United States, 87 Ct.Cl. 358, 371; Randall v. United States, 71 Ct.Cl. 152, certiorari denied 283 U.S. 826, 51 S.Ct. 349, 75 L.Ed. 1440; Stanton v. United States, 68 Ct.Cl. 379.

In Blair v. Chicago, 201 U.S. 400, 471, 26 S.Ct. 427, 445, 50 L.Ed. 801, the Supreme Court stated the reason for strict construction of acts granting special privileges, which is equally applicable to jurisdictional acts which are said to confess liability. Among other things, the court said:

"* * * It is matter of common knowledge that grants of this character are usually prepared by those interested in them, and submitted to the legislature with a view to obtain from such bodies the most liberal grant of privileges which they are willing to give. This is one among many reasons why they are to be strictly construed."

There is still another thing that leads us to believe that Congress did not intend to confess liability. If this had been its intention, there would have been no use in referring the matter to this court, for there would have been nothing for us to do except to compute the amount of interest the plaintiff is entitled to, since all the facts had been very clearly determined by the Comptroller General and agreed to by the plaintiff. Certainly Congress did not mean to ask this court merely to compute interest.

Plaintiff, on the other hand, says that Congress did not mean for us to determine the liability of the United States under the Act of July 27, 1861, 12 Stat. 276, which is the only Act prescribing the liability of the United States, because, it says, none of the items were allowable under that Act, as construed by the so-called Chase regulations, and, hence, that Congress would have been doing a futile thing in referring the case to us. We do not think this argument is sound.

It may be true that under the Chase regulations plaintiff would not be entitled to recover, but Congress in its reports more than once questioned the validity of these regulations. It had never been determined by the Supreme Court that these regulations were valid; and, thus, Congress may well have had in mind calling on this court, in the first instance, to determine the validity of those regulations, as applied to the facts of this particular case, with the right of review by the Supreme Court.

It is true that this court in State of Nevada v. United States, 45 Ct.Cl. 254, 284 et seq., had held that these regulations were valid, but the court in that case did not have before it the facts presented in the present case; nor was that case taken to the Supreme Court. The jurisdictional act in this case provides for a review by the Supreme Court of any judgment we may render; and, so, Congress may well have had in mind that this court might not arrive at the same conclusion in this case as it did in the case of State of Nevada, supra, or that, if this court did follow its former decision in that case, the Supreme Court might take a different view, and hold that the Chase regulations were not valid, as applied to the facts in this case.

At any rate, there is no clear evidence of an intention on the part of Congress to confess liability.

As a matter of fact, a number of bills have been introduced in Congress making an outright appropriation to pay the claim of the State of California, and a number of these bills have passed the Senate, but the House of Representatives has not concurred; and, hence, the bills have not been enacted into law. Then, when the bill, culminating in the Act now before us, was introduced in the 81st Congress, that Congress decided to

refer the case to this court, rather than make an appropriation to pay the claims, so that we might determine whether or not the claims were valid, and the amount of them. If Congress, by the passage of the jurisdictional act, had intended to confess liability, it would have done what the Senate had done on many other occasions, it would have made a direct appropriation to pay the claims. It would not have referred the case to this court if it had already determined that the claim should be paid.

The fact that it refused to pass an Act appropriating the money to pay them, but, on the other hand, referred the case to us to determine it, to settle the controversy, is a clear indication that Congress did not intend to confess liability.

It would seem that all doubt about this question is removed by the following: The bill, which was the forerunner of the Act of September 25, 1950, provided:

"Judgment under this Act shall be allowed notwithstanding the bars or defenses of any counterclaim, laches, or statute of limitations, *and without the permission on the part of the Government, or its representatives, to interpose any kind of defense to said claims,* except to insure accuracy in the computation of said advances and expenditures in the manner prescribed by section 2.

"* * * judgment by the Court of Claims shall be final upon the parties and shall not be subject to review." [Italics ours.]

This bill was not reported or passed, but, instead, in the words of the committee, it was redrafted "with the thought in mind that the State be required to prove its claim as in any other litigated action." The bill as passed eliminated the provision denying "permission on the part of the Government, or its representatives, to interpose any kind of defense to said claims," and provided, instead, that only the defenses of laches and the statute of limitations were waived; and the committee said,

"all other defenses are preserved to the Government."

However, the plaintiff very strongly urges that the legislative history shows that Congress did intend to confess liability. We do not think there is any doubt about the fact that several committees, both of the House and the Senate, thought these claims ought to be paid, and, as we have stated above, the Senate, on eight different occasions, passed a bill to pay them; but the report of the committee passing this bill certainly does not show that it was the intention of the present Congress to confess liability.

Plaintiff chiefly relies upon Senate Report No. 2446, 81st Congress, 2d Session. This report reiterates the statement in the Act itself that it confers jurisdiction on this court "to hear and determine and render judgment on the claims of the State of California arising out of moneys allegedly advanced and expenditures allegedly made in aid of the United States during the War Between the States for such advances and expenditures, if any, * * *." Then the committee says, as the Act says, that "the court is directed by the Act to include in such judgment, *if any,* the interest" etc. [Italics ours.] Then in the next paragraph the committee, repeating the language of the Act, says, "Judgment under this Act shall be allowed, notwithstanding the lapse of time, the bars or defenses of laches, or any statute of limitations."

But the report goes on to say, "all other defenses are preserved to the Government * * *."

Thus, the report explicitly says that it was not intended to confess liability, but it preserves to the Government the right to interpose any defense to the claim which it might have, save only laches and the statute of limitations.

Now, it is quite true that this report indicates that the committee thought that the claim ought to be allowed. It points out that bills for reimbursement of the State have passed the Senate

eight times, it says, and it adopts the report of the House Committee (No. 1162 of the 74th Congress, 1st Session), and the report of the Senate Committee (No. 432 of the 74th Congress, 1st Session), and these reports clearly indicate that these committees thought the claims ought to be allowed. But an expression of opinion by these committees that the claims ought to be allowed falls far short of a direction by Congress to this court to allow them.

If the latter had been the intention of Congress, it never would have referred the claims to this court at all, but it would have gone ahead and made the appropriation to pay them.

## II

Counsel for plaintiff in his oral argument and throughout their brief confess that the plaintiff is not entitled to recover under the Act of July 27, 1861, 12 Stat. 276, as that Act was interpreted by the so-called Chase Regulations. We have nevertheless reexamined that Act and the regulations.

The Act reads as follows:

*"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That the Secretary of the Treasury be, and is hereby, directed, out of any money in the Treasury not otherwise appropriated, to pay to the Governor of any State, or to his duly authorized agents, the costs, charges, and expenses properly incurred by such State for enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops employed in aiding to suppress the present insurrection against the United States, to be settled upon proper vouchers, to be filed and passed upon by the proper accounting officers of the Treasury."

Under this Act the State was entitled to its "costs, charges, and expenses properly incurred by such State for enrolling, subsisting, clothing, supplying, arming, equipping, paying, and transporting its troops employed in aiding to suppress the present insurrection against the United States * * *."

There is no controversy over the amounts spent by plaintiff State, but we are called upon to determine whether or not those amounts were "properly incurred," and also to determine whether or not they were incurred "in aiding to suppress the present insurrection against the United States."

When this Act was passed, Salmon P. Chase was Secretary of the Treasury, later Chief Justice of the United States. This department was charged with the duty of carrying out the purposes of the Act. The Secretary issued regulations for the guidance of his agents in doing so. If these regulations are valid, plaintiff is not entitled to recover. The regulations read:

"Rules for the preparation and settlement, at the Treasury Department, under acts of Congress approved July 17, 1861, and July 27, 1861, of claims for reimbursement of expenses properly incurred by the States, respectively, on account of their troops employed in aiding to suppress the present insurrection against the United States.

"1. Accounts, with vouchers, for all expenditures made, must be presented to the Secretary of the Treasury, by whom they will be referred to the proper accounting Officers for investigation and settlement.

"2. It is only for expenditures on account of troops, Officers, or men that have been or may be mustered and received into, or actually employed in, the service of the United States that reimbursement will be made. Organizations raised, or attempted to be raised, but not mustered and received into, nor actually employed in, the service will not be recognized. Nor will any reimbursement be made by the United States of expenses incurred in or-

ganizing, equipping, and maintaining troops for State purposes, or home guard, whether called out by State or other local authority, unless such troops were called out and such expenses incurred at the request or under the authority of the President or the Secretary of War.

"3. Personal expenses of Commissioned Officers in recruiting their companies, prior to their being mustered into service, will not be allowed; but commissioned Officers may be allowed the same rates for subsistence and quarters (board and lodging) as privates, from the date of enrollment until mustered into service. The necessary and actual travelling expenses of recognized military agents of the State, when accompanied by bills of particulars and receipts for payments will be refunded.

"4. Bills of particulars, with dates, and rate of charge, and the receipt of the party to whom payment was made, must, in all cases, be furnished. It is not sufficient to show that a gross amount was expended; still less that sums were turned over to individuals to expend, without evidence showing that they were expended by them, and how they were expended. In short, original vouchers for expenditures of every description must be furnished. The expenditures should be classified, and separate abstracts with the vouchers presented for pay, subsistence, clothing, transportation, arms, and equipments, and other expenses; and they should also designate, as far as practicable, the particular regiment or corps on account of which the expenditures were incurred. Claims for pay of troops must be accompanied with complete pay rolls for each corps, properly certified and receipted, the same as are required in the regular service.

"5. Where subsistence in kind could not be furnished and expenses were incurred for "board," or "lodging," the rates will depend on the section of Country where furnished and the price paid for complete rations at the nearest recruiting station or military post; and in no case will a higher rate be allowed than the amount actually paid. The bills must specify the regiment or company to which the troops so subsisted or quartered belonged, and that rations could not be procured. Bills for lodging will be restricted to cases where there were no tents, and quarters could not be otherwise obtained.

"Purchases of subsistence in bulk will be paid for at not exceeding the current prices at the place of purchase, provided that the quantities are in proper proportions, or reasonably so, to the number of men according to the rates of allowance in the Subsistence Department.

"The articles of subsistence must be such only as are recognized in the regular service, or if other articles are substituted, the cost of the whole must not exceed the regular supplies. Bills for spirituous liquors, treating, expenses of holding elections for Officers, will not be recognized or paid.

"6. Transportation and quarters for troops at reasonable rates will be paid for. Transportation is restricted to the usual routes and modes of conveyance, and excessive quantities will not be recognized. Wagon hire for the transportation of the men themselves will not be sanctioned. Charges for transportation by railroad, or other public conveyance, must be accompanied by bills of lading in cases of property or supplies; and for troops, the number of men, with the regiment or corps, must be distinctly set forth, and when the same has been done in pursuance of a contract, the contract must accompany the vouchers, the same provisions apply to transportation by vessel.

"7. Claims growing out of impressment of property or services, and for damages done to individuals, or their property, are not authorized to be paid. Provision for such claim must be made by special acts of Congress, when not already provided for by general laws.

"8. Bounties or donations to men, or their families, to induce men to volunteer, will not be recognized. Such bounties as may be authorized by law will be paid by the United States directly to the men authorized to receive them. Voluntary contributions, either by States or local corporations or by individuals, in aid of families of volunteers, etc., constitute no charge against the United States, and will not be refunded.

"9. Each State must present its full and final accounts for reimbursement, under the acts providing therefor, up to the date of the passage of said acts. The proper authorities of the State should certify, over their Official Seals, that the respective amounts claimed to be refunded have been actually paid by said State, and that no part thereof has been paid by any disbursing Officer of the United States."

These regulations were promulgated quite some time before plaintiff made any of the expenditures it seeks to recover. When plaintiff spent the money it was well aware of the regulations, or should have been. They have been in effect for nearly 100 years. They were promulgated by the department charged with the duty of administering the Act. They have never been attacked in court except in the case of Nevada v. United States, supra. They were held valid in that case and no appeal was taken to the Supreme Court. That case was decided forty-four years ago.

All other states, except Nevada, have acquiesced in these regulations and in the denial of their claims on the basis of them.

■ We think they were reasonably designed to carry out the Act of Congress, and, therefore, have the force and effect of law.

■ 1. Plaintiff's first claim is for $468,976.54 for militia expenses.

The militia was never mustered into the service of the United States. With one minor exception, it never saw any active service. Under an Act of the California legislature, approved April 24, 1862, Statutes of California 1862, pp. 362–383, the militia was required to be assembled for instruction at least once a month, and paraded for review and inspection at least two days a year. The officers and non-commissioned officers were required to attend a ten-day camp once a year for military instruction. It thus appears that the men just met once a month and did a few squads right and squads left, did some saluting, and were dismissed.

During 1862 and 1863 there were 5,000 men in the organized militia, and 8,250 in 1864. They saw no active duty, save only for 100 men thereof who served for 90 days in repelling an invasion by hostile Indians.

For this latter service California has been reimbursed by the United States.

Under the Chase regulations the Government is not required to reimburse the State for such expenditures. Paragraph II of these regulations reads as follows:

"It is only for expenditures on account of troops, officers, or men that have been or may be mustered and received into, or actually employed in, the service of the United States, that reimbursement will be made. Organizations raised, or attempted to be raised, but not mustered and received into, nor actually employed in, the service, will not be recognized. Nor will any reimbursement be made by the United States of expenses incurred in organizing, equipping, and maintaining troops for State purposes, or home guard, whether called out by State or other local authority, unless such troops

were called out and such expenses incurred at the request or under the authority of the President or the Secretary of War."

We think this regulation was reasonably designed to carry out the will of Congress as expressed in the Act of July 27, 1861, supra, which provided for reimbursement to the State for subsisting, etc., troops, "employed in aiding to suppress the present insurrection against the United States." The militia of California was not employed in fighting the Confederacy, and, hence, the expenses of maintaining it quite clearly does not come within the provisions of the Act of 1861.

No other State has been reimbursed for these expenses.

Plaintiff is not entitled to recover on this claim.

■ 2. The State of California paid its volunteers the amount of $1,459,270.-21, in addition to the pay to which they were entitled from the United States

The Chase regulations denied such expenditures, as these regulations were construed by this court in Nevada v. United States, supra. Paragraph 8 provides:

"Bounties or donations to men, or their families, to induce men to volunteer, will not be recognized. Such bounties as may be authorized by law will be paid by the United States directly to the men authorized to receive them. Voluntary contributions, either by States or local corporations or by individuals, in aid of families of volunteers, etc., constitute no charge against the United States, and will not be refunded."

In that case we held that this extra pay was a bounty and, therefore, that it was nonreimbursable under the Chase regulations.

Under the Act of April 4, 1864, Statutes of California 1863–1864, p. 486, a bounty of $160 was authorized to be paid to California volunteers on their first enlistment, and $140 was authorized to be paid for a reenlistment. This was in addition to the extra pay.

Certain bounties were authorized by Acts of Congress, and these have been paid to California volunteers as well as to other volunteer troops serving during the war. Congress did not authorize the payment of additional bounties to California troops, and there is no showing that conditions justified the payment of an extra bounty to them. California troops, except for 100 men, were not used to do any fighting; they did only garrison duty and patrol duty. If bounties had to be paid to induce men to enlist in the Union armies, it would seem that they would be more required to induce men to fight than to sit in a fort or to do patrol duty.

Much is made of the fact that living expenses in California were exceedingly high during this period, and this is no doubt true. They were perhaps higher than they were in other parts of the country, but we cannot say that bounties in addition to those offered by the United States were necessary, in addition to the compensatory extra pay, to induce Californians to come to the aid of the other States in their effort "to suppress the present insurrection."

The Chase regulations, as will be noted from the above quotation, expressly forbade the reimbursement of these bounties, and such claims of all other States, except Nevada, have been denied. New York, for instance, spent $35 million for bounties, and for this it has not been reimbursed.

Since Congress had already authorized the payment of such bounties as it thought proper, the Chase regulations very properly said, we think, that any additional bounties paid by the States would not be reimbursed, and no other State, except Nevada, has been reimbursed for them. If California is reimbursed for the bounties paid its soldiers for guarding lines of communication, and the other States have not been paid for bounties paid to their troops who were engaged in actual warfare on the field of battle, it would be given a

preference over other States to which we think it is not entitled. We do not believe that Congress intended to accord it such preference.

It is true that Congress, by a special Act, authorized reimbursement to Nevada for the bounties it paid its troops, but Nevada's situation was somewhat different from the situation of California. The report of the committe explained its recommendation for the passage of the bill partly because Nevada, until 1864, was a territory of the United States and because the Acts of its territorial legislature were subject to the approval of Congress, and hence, the committee thought its Acts providing for the bounties were sanctioned by Congress, since Congress had not disapproved them.

However this may be, Nevada was thus given preferential treatment over all other states in the Union. Because Nevada was given this preferential treatment, it by no means follows that California should also be given this preferential treatment. It would rather seem that it should be treated according to the rule applied to other states, and not according to the exception to the rule.

 3. The next claim is for recruiting expenses in the amount of $24,260. The proof shows that $8,985.15 of this amount was properly expended by the recruiting officers, but there is no satisfactory evidence that the balance was properly expended. Paragraph 4 of the Chase regulations provides:

"Bills of particulars, with dates, and rate of charge, and the receipt of the party to whom payment was made, must, in all cases, be furnished. It is not sufficient to show that a gross amount was expended; still less that sums were turned over to individuals to expend, without evidence showing that they were expended by them, and how they were expended. In short, original vouchers for expenditures of every description must be furnished. The expenditures should be classified,

and separate abstracts with the vouchers presented for pay, subsistence, clothing, transportation, arms, and equipments, and other expenses; and they should also designate, as far as practicable, the particular regiment or corps on account of which the expenditures were incurred. Claims for pay of troops must be accompanied with complete pay rolls for each corps, properly certified and receipted, the same as are required in the regular service."

This paragraph was not complied with. For the lack of proof, the State is not entitled to reimbursement for this item, except for $8,985.15. For this amount it is entitled to judgment.

 4. The next claim is for $23,277.34 paid to California volunteer line officers prior to the induction of their units into the federal forces.

Plaintiff is not entitled to reimbursement for this item under the Chase regulations. These regulations provide in paragraph 3:

"Personal expenses of Commissioned Officers in recruiting their companies, prior to their being mustered into service, will not be allowed; * * *."

Under Army regulations, captains and 2d lieutenants were entitled to pay from the date the company was raised to the full minimum number, or when mustered in by special order, and 1st lieutenants were entitled to pay from the date the company was raised to one-half of the minimum number. We understand that captains and lieutenants of California volunteers have been paid in accordance with these War Department regulations. If the State is reimbursed for payments made to its volunteer officers by the State of California over and above what they were entitled to under Army regulations, then it will receive an amount which the regulations expressly refused to authorize, and an amount for which no other State has been reimbursed.

We do not think plaintiff is entitled to recover on this claim.

5. Plaintiff's next claim is for the expenses of its Adjutant General. The amount claimed is $38,083.17, of which $14,850.05 is for the salary of the Adjutant General from April 15, 1861 to August 20, 1866.

By the Act of April 24, 1862, the organization and function of the State militia were more broadly defined than they had been under the Act of April 25, 1855. Under both Acts, however, the Adjutant General was named as the Chief of Staff of the Militia, its Quartermaster General, its Commissary General, its Inspector General, and its Chief of Ordnance. Since we have held that the militia expenses were not reimbursable by the United States, it must follow that the salary of the head of the militia is not reimbursable. His salary during the war years was no greater than it had been before the war, and, therefore, it cost the State no more during the war than it had before to pay the salary of the Adjutant General. Clearly, his salary is not a proper item of reimbursement.

Plaintiff, however, says that during the war years the Adjutant General was responsible for the payment of bounties and extra pay to the volunteers raised by the State, and that because of these extra duties he had to largely increase his clerical force. We have held that bounties are not reimbursable, and, hence, the expense of paying them is not reimbursable.

6. Since we have held that plaintiff is not entitled to recover the extra pay and bounties, it is not entitled to recover the interest on the bonds issued to pay these items, nor the discount at which the bonds were sold, nor the cost of printing the bonds.

Plaintiff is entitled to recover the sum of $8,985.15. Judgment for this amount will be entered.

JONES, Chief Judge, and MADDEN and LITTLETON, JJ., concur.

**CHALENDER v. UNITED STATES.**

No. 49091.

United States Court of Claims.
March 2, 1954.

